280 N.J. Super. 62 (1995)
654 A.2d 503
ELAT, INC., FORMERLY NAMED EXACT LEVEL & TOOL, INC., A CORPORATION DULY ORGANIZED UNDER THE LAWS OF THE STATE OF PENNSYLVANIA, PLAINTIFF-APPELLANT,
v.
AETNA CASUALTY AND SURETY COMPANY, A CORPORATION DULY ORGANIZED UNDER THE LAWS OF THE STATE OF CONNECTICUT, CIGNA PROPERTY AND CASUALTY INSURANCE COMPANY, A CORPORATION DULY ORGANIZED UNDER THE LAWS OF THE STATE OF CONNECTICUT, THE HOME INSURANCE COMPANY, A CORPORATION DULY AUTHORIZED UNDER THE LAWS OF THE STATE OF NEW YORK, CITY INSURANCE COMPANY, A WHOLLY-OWNED SUBSIDIARY OF THE HOME INSURANCE COMPANY, A CORPORATION DULY ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY AND JOHN DOE INSURANCE COMPANIES 1-5, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 1994.
Decided March 7, 1995.
*63 Before Judges BRODY, LONG and ARNOLD M. STEIN.
Keith E. Lynott argued the cause for appellant Elat, Inc. (McCarter & English, attorneys; Mr. Lynott, of counsel; J. Forrest Jones and Vito A. Pinto, on the brief).
*64 Frank A. Lattal argued the cause for respondent, Aetna Casualty and Surety Company and Peter M. Papasavas argued the cause for City Insurance Company and The Home Insurance Company (Connell, Foley & Geiser, attorneys and Sheft & Sheft, attorneys; Sheldon Karasik, of counsel; Mr. Papasavas, on the brief).
Joseph E. Boury argued the cause for respondent Cigna Property and Casualty Insurance Company (O'Melveny & Myers, attorneys; Paul R. Koepff, of counsel; Mr. Boury, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
From approximately 1939 to 1983, Peter Vaida was the owner of ELTM, a tool manufacturing facility he operated at an industrial site in High Bridge, New Jersey. During portions of that period, the defendant insurance companies (Aetna, Cigna, Home and City) issued insurance policies providing comprehensive general liability insurance to Elat, Inc. In January 1983, Plaintiff Elat acquired the assets of ELTM and leased the site until December 31, 1985. During that time, Elat carried on substantially the same precision tool manufacturing business that ELTM had earlier conducted. ELTM was dissolved in 1986. Vaida died in 1987. Upon his death, the facility and the insurance policies issued by defendants became, by operation of law, the property of the estate of Peter Vaida (the "Estate").
In connection with its cessation of operations at the facility, Elat was required to comply with the environmental investigation provisions of the New Jersey Environmental Cleanup Responsibility Act ("ECRA"), N.J.S.A. 13:1K-6 to -35 (now, the Industrial Site Recovery Act, "ISRA"). (ECRA was enacted by the New Jersey Legislature following Elat's acquisition of the assets of ELTM and before the termination of the lease.)
The cleanup investigation revealed that, from approximately 1939 through 1983, ELTM's disposal of materials and wastes generated in manufacturing processes at the High Bridge premises *65 resulted in extensive soil and groundwater contamination. Elat maintains that to date, it has spent over $1,000,000 in investigating and remediating the soils and groundwater, and that the future costs to remediate groundwater contamination will reach $1.5 to $1.95 million.
In July 1988, Elat instituted an action in the United States District Court against ELTM, the Estate and other affiliated entities seeking damages, contribution and indemnification for the costs incurred, and to be incurred in the future, in conducting the environmental investigation and remediation of the facility. In connection with this action, the Estate demanded coverage from defendants which was denied.
On May 1, 1991, the parties entered into a Consent Judgment pursuant to which ELTM, the Estate and others were adjudicated liable to Elat for damages in the amount of $628,360 for the costs incurred to investigate and remediate contamination of the soils and groundwater at the High Bridge premises, together with all such costs to be incurred in the future. The Estate, however, had a negative net value. Thus, it could not satisfy the judgment. In return for Elat's agreement not to execute on the Estate's other assets pending this action, the Estate assigned to Elat all of its rights and claims against defendants.
On November 15, 1991, Elat filed the present action against defendants. Defendants Home and City moved to dismiss the Complaint. The trial judge granted the motion. In so doing, he held that the assignment from the Estate to Elat was ineffective because the policies contained express provisions that prohibited assignment unless consented to and endorsed by the insurers. He also held that N.J.S.A. 17:28-2 prohibits an injured party who has a judgment against an insured from maintaining an insurance coverage action directly against the insurance company until "execution against the insured has been returned unsatisfied by reason of bankruptcy or insolvency." Elat sought interlocutory relief which was denied. Subsequently, defendants Aetna and Cigna *66 filed motions to dismiss the complaint which were granted. This appeal as of right by Elat followed.
Elat's primary argument on appeal is that what occurred in this case was not the kind of an assignment interdicted by the policies. We agree with this contention and reverse. Under the language of each of the relevant insurance policies, the insurer agreed to pay any and all damages for which the insured became legally obligated resulting from property damage arising from an occurrence. Also included were provisions prohibiting the assignment of any interest in the policies to a third party. City's policy contains an example of the language which is at the heart of this dispute:
Assignment of interest under this policy shall not bind the Company unless and until their consent is endorsed hereon.
Elat contends this language prohibits assignment of a policy and not assignment of a claim. We agree.
In Flint Frozen Foods v. Firemen's Ins. Co., 12 N.J. Super. 396, 399, 79 A.2d 739 (Law Div. 1951), rev'd on other grounds 8 N.J. 606, 86 A.2d 673 (1952), the court interpreted an insurance policy containing the following language which is effectively identical to the language at issue here: "Assignment of this policy shall not be valid except with the written consent of this company." The court held that once a loss occurs, the assignment is of the loss and not the policy and is thus not barred by a no-assignment provision. In so ruling, Flint relied on Ocean Accident and Guarantee Co. v. Southwestern Bell Tel. Co. which explained the distinction:
The recognized reasons for the prohibition of assignments without the consent of the insurer had ceased. Its liability had become fixed, and like any other chose in action was assignable regardless of the conditions of the policy in question. This is settled by the great weight of authority. In Wood on Fire Insurance, vol. 2, par. 361 the doctrine is stated thus: "Where the policy prohibits an assignment an assignment without the insurer's consent invalidates it, but, in the absence of such a condition, the validity of the policy is not affected thereby, but still remains operative as to the assured; nor does an assignment after a loss has transpired invalidate it. In such case the insurer becomes absolutely a debtor to the assured for the amount of the actual loss, to the extent of the sum insured, and it may be transferred or assigned like any other debt. After a loss the delectus personae no longer becomes material, and even though the policy prohibits such an assignment, *67 and provides that if so assigned the policy shall be void, it is held that such prohibition is void, as the insurer cannot restrict the assignment of a debt. The reasons that induce the restrictive clause have no existence or application after the risk has ceased."
[Flint, supra, 12 N.J. Super. at 400-01, 79 A.2d 739 (citing Ocean Accident and Guarantee Co. v. Southwestern Bell Tel. Co., 100 F.2d 441, 445 (8th Cir.), cert. denied, 306 U.S. 658, 59 S.Ct. 775, 83 L.Ed. 1056 (1939)).]
This reasoning has been approved by most insurance law reporters and commentators. E.g., 16 George J. Couch, Couch Cyclopedia of Insurance Law § 63.40 (rev. 2d ed. 1983); 5A John A. Appleman, Insurance Law and Practice § 3458 (rev. ed. 1970).
No-assignment [provisions within insurance policies] do not prevent the assignment after loss for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising thereunder, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the assignment of a right to a money claim.
[Couch, supra, § 63.40.]
The rationale for this conclusion is related to the purpose behind a no-assignment clause in a casualty or liability policy which is to protect the insurer from insuring a different risk than intended. Assignment of the right to collect or to enforce the right to proceed under a casualty or liability policy does not alter, in any meaningful way, the obligations the insurer accepted under the policy. The assignment only changes the identity of the entity enforcing the insurer's obligation to insure the same risk. Thus, the purpose behind the no-assignment clause is not inhibited by allowing claim, as opposed to policy, assignment.
Moreover, there is a salutary purpose behind claim assignment where, as here, the insured lacks either sufficient resources or the will to undertake coverage litigation.
The claimant awarded damages may be left with a judgment-proof debtor whose only valuable asset is his cause of action against his insurer. It is unlikely that such an insured would undertake a complex and expensive suit against the insurer offering him no direct benefits. This would leave the injured party without recourse for his damages and would allow insurance companies to play fast and loose with claims against their less affluent policyholders.
[Liberty Mut. Ins. Co. v. Davis, 412 F.2d 475, 485 (5th Cir.1969).]
*68 Thus, claim assignability greatly facilitates the compensation of injured parties. "[T]he strong public policy in this State favor[s] the availability to injured persons of the liability of those whose negligence is the cause of the plight." Sneed v. Concord Ins. Co., 98 N.J. Super. 306, 321, 237 A.2d 289 (App.Div. 1967).
In the face of Flint and the principles to which we have adverted, it is clear that the assignment to Elat did not violate the insurance contracts. This ruling, which validates a direct action by Elat against the insurers under the assignment, makes it unnecessary for us to address the remaining issues raised by Elat.
The insurers are free to attack the fairness and reasonableness of the settlement underlying the consent judgment in an action in which they may also argue that the liabilities included in the consent judgment are not covered risks. Griggs v. Bertram, 163 N.J. Super. 87, 96-97, 394 A.2d 174 (Law Div. 1978), aff'd in part, rev'd in part, 88 N.J. 347, 443 A.2d 163 (1982); Jefferson Ins. Co. v. Health Care Ins. Exch., 247 N.J. Super. 241, 247-48, 588 A.2d 1275 (App.Div. 1991).
Reversed and remanded.