2008 VT 105

# In re Ambassador Insurance Company, Inc.

[965 A.2d 486]

No. 07-232

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed August 14, 2008

*Andre D. Bouffard* and *Charlotte B. Ancel* of *Downs Rachlin Martin PLLC*, Burlington, for Appellant National Indemnity Company.

*Bernard D. Lambek* of *Zalinger Cameron & Lambek, PC*, Montpelier, and *Brian T. Himmel* of *Reed Smith LLP*, Pittsburgh, Pennsylvania, for Intervenor-Appellant A.P. Green Industries, Inc.

*Peter F. Young*, Assistant General Counsel, Montpelier, and *Richard B. Whitney* and *Tracy K. Stratford* of *Jones Day*, Cleveland, Ohio, for Appellee Department of Banking, Insurance, Securities and Health Care Administration.

¶ 1. **Skoglund, J.** In this appeal, we consider the proper priority status for claims made by an insured's assignee against an insolvent insurer. Liquidator of the insolvent insurance company, Ambassador Insurance, determined that claims — originally held by an insured, A.P. Green Industries, Inc., and classified as priority four claims — should be reclassified as priority five general-creditor claims after Green assigned its payment rights to National Indemnity Company (NICO). NICO challenged the reclassification, and the superior court granted summary judgment to liquidator,[1] concluding that the consent-to-assignment clauses in the insurance contracts barred assignment and that under the plain meaning of the priority statute, claims made by the assignee of an insured are not entitled to priority four status. NICO appeals the order, arguing that the assignment in this case does not change the priority status of the claims. We agree with NICO, and reverse and remand.

¶ 2. The parties do not dispute the material facts. Ambassador was a property and casualty insurance carrier that issued two occurrence-based excess liability insurance policies to Green covering the period of December 1982 to June 1984. Each policy provided ten million dollars of excess coverage in the fourth layer of coverage (consisting of twenty-five million dollars) in excess of twenty-six million dollars in the underlying three layers. Each policy contained a consent-to-assignment clause that stated: "Assignment of interest under this policy shall not bind [Ambassador] unless and until its consent is endorsed hereon."

---

[1] Various parties refer to the appellee in this case as the Commissioner, the liquidator and the receiver. For simplicity, we use "liquidator" to refer to the party opposing appellant.

¶ 3. Because Ambassador was experiencing financial difficulties, the superior court placed the insurance company in a receivership in November 1983. In March 1987, the superior court issued a liquidation order, appointing the Commissioner of Banking and Insurance[2] as liquidator, and dictating that distributions would be made following claim approval pursuant to the statutory scheme in effect at that time.[3]

¶ 4. The policy Ambassador issued to Green was one of many that Green had to insure against losses connected with its business, which included the manufacture, distribution, and installation of asbestos-containing products. Alleging injury from exposure to asbestos-containing material, injured parties began filing tort actions against Green in the 1980s. Green sought defense and indemnification in these cases from its various insurance providers. Although it did not originally appear that Ambassador's layer of excess coverage would be implicated, Green filed a proof-of-claim for policy protection for each Ambassador policy in the liquidation proceeding. The number of asbestos-related cases against Green grew in the 1990s, and, by 2001, it appeared that Ambassador's layer of coverage would be implicated. At that point, Green had settled about 200,000 asbestos-related claims for approximately four hundred and forty-six million dollars. There remained unfunded judgments and settlements involving about 49,500 asbestos-related claims of four hundred and ninety-two million dollars and more than 235,000 asbestos-related claims pending.

¶ 5. In 2001, because it was experiencing financial distress due to its massive asbestos-related liabilities, Green arranged to assign its claims against three insolvent insurance companies, including Ambassador, to NICO in exchange for immediate cash. NICO and Green entered an agreement whereby NICO paid Green one million dollars and Green assigned "all right, claim, title and interest" to payment in the Ambassador policies to NICO. In addition, NICO agreed to pay Green half of any amount that it might recover over three million dollars, after expenses. Green retained the management of and financial obligations for the claims. Under the weight of asbestos litigation and other business

---

[2] This position is now the Commissioner of Banking, Insurance, Securities, and Health Care Administration. See 3 V.S.A. § 212(3).

[3] As the order provides, the liquidation-priority statute applied in this case is from the version of the statute in effect at the time of the liquidation order, then cited at 8 V.S.A. § 3595. See 1979, No. 18, § 2.

difficulties, Green filed for Chapter 11 bankruptcy in February 2002. The bankruptcy court approved Green's agreement with NICO. The court also approved Green's reorganization plan, which included the creation of two trusts for the benefit of Green's asbestos claimants. Any payment received pursuant to Green's agreement with NICO will be used to help fund these trusts.

¶ 6. Following the assignment, NICO submitted a claim to liquidator for twenty million dollars, the full amount due under the two policies. Liquidator determined that the claims were no longer class four policyholder claims and reclassified the claims as priority five general-creditor claims. In his letter notifying NICO of this decision, liquidator explained that although priority four claims were being paid at ninety percent, it was unlikely that priority five claims would be paid at all.

¶ 7. NICO requested review of the reclassification decision by the superior court, as permitted by the claims dispute resolution procedure in the liquidation order. The court referred the matter to a special master. The master concluded that the claims should be treated as priority four only to the extent that the funds would benefit Green's asbestos claimants. The master recommended that in all other respects the claims should be classified as priority five. Both parties objected to the master's decision to grant hybrid status to the claims.

¶ 8. NICO and liquidator each filed motions for summary judgment in superior court on the issue of the priority status of the claims.[4] The court determined that there were no issues of material fact and granted summary judgment to liquidator. In its decision, the trial court held that the assignment was invalid because neither Green nor NICO sought or received permission from Ambassador/liquidator to assign the claims as required by the consent-to-assignment clauses in the insurance contracts. The court also held that "the plain language of the statute suggests

---

[4] At that time, Green sought, and was granted, permission to intervene in the superior court proceedings as an interested party. In its submission to the court, Green argued that its assignment to NICO did not change the character of the claims. Green maintained that any proceeds it received from its agreement with NICO would be used to fund a trust for the benefit of its creditors holding asbestos and silica personal injury claims. Green also appears as an intervenor in this Court, arguing that the claims should retain their priority four status. Green contends that the assignment did not create any increased risk to Ambassador and that its asbestos creditors will suffer if the priority of the claims is changed.

that, with the exception of guaranty associations, the fourth priority simply does not extend to claims by assignees of policyholders, beneficiaries, or insureds." Thus, the court explained that, in its view, "[c]laims by ordinary assignees fall under the catch-all fifth priority." In response to NICO's argument that the assignments were valid as mere assignments of a right to payment, which are freely transferable under common law, the court concluded that the assignment was not merely for a payment right because the liabilities were not yet reduced to certain amounts. The court further explained that the assignment changed the nature of the relationship between Ambassador and Green, and exposed Ambassador to an increased risk of loss. Thus, the court held that liquidator properly reclassified the claims as priority five general-creditor claims. NICO filed a timely notice of appeal.

¶ 9. On appeal, NICO argues that the superior court erred in: (1) applying the consent-to-assignment clauses when the assignment involved a payment right to a post-loss claim and not an assignment of the policy itself; (2) concluding that the assignment resulted in an increased risk to Ambassador; and (3) interpreting the priority statute to exclude claims by assignees of insureds from priority four status.

¶ 10. In reviewing a decision granting summary judgment, this Court applies the same standard as the trial court. *O'Donnell v Bank of Vt.*, 166 Vt. 221, 224, 692 A.2d 1212, 1214 (1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3); *O'Donnell*, 166 Vt. at 224, 692 A.2d at 1214. When both parties have moved for summary judgment, we resolve all reasonable doubts and inferences in favor of the party opposing the motion being judged. *Bixler v. Bullard*, 172 Vt. 53, 57, 769 A.2d 690, 694 (2001).

I.

¶ 11. NICO first argues that the superior court erred in concluding that the consent-to-assignment clauses in the Ambassador policies can be enforced so as to deny NICO status as a priority four claimant. The parties agree that each of Ambassador's contracts with Green included the consent-to-assignment clause quoted above, and that neither Green nor NICO sought Ambassador's consent prior to entering their assignment agree-

ment. In addition, liquidator does not dispute that Green assigned only its right to payment under the policies, and retained responsibility for managing the claims and paying injured parties. NICO maintains that the clause does not preclude assignment in this case because Green merely assigned a right to recover for a loss that had already occurred. According to NICO, there is no restriction on assignment of such a chose in action without a showing of an increased risk of loss to the insurer, which is absent here. We agree that the policy clause does not bar assignment in this case.

¶ 12. Most courts and commentators agree that post-loss assignment of payment under an insurance policy is not subject to a consent-to-assignment clause "for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising thereunder." 3 L. Russ & T. Segalla, Couch on Insurance § 35:7, at 35-8 to 35-9 (3d ed. 1995); see also *St. Paul Fire & Marine Ins. Co. v. Allstate Ins. Co.*, 543 P.2d 147, 149 (Ariz. Ct. App. 1975); *Elat, Inc. v. Aetna Cas. & Sur. Co.*, 654 A.2d 503, 505-06 (N.J. Super. Ct. App. Div. 1995). Although anti-assignment clauses in insurance policies are enforceable against "attempted transfers of the policy itself before a loss has occurred," such a provision "does not in any way limit the policyholder's power to make an assignment of the rights under the policy — consisting of the right to receive the proceeds of the policy — after a loss has occurred." 17 R. Lord, Williston on Contracts § 49:126, at 124 (4th ed. 2000). The distinction between pre- and post-loss assignment is consistent with the purpose of the no-assignment clause in insurance contracts, which is "to protect the insurer from increased liability." 3 Russ & Segalla, *supra*, § 35:7, at 3 (Supp. 2007). An insurer has a legitimate interest in deciding whether to allow assignment of rights under an insurance policy because the identity of the insured determines the risk to the insurer. In contrast, once an event occurs that triggers an insurer's liability, "the insurer's risk cannot be increased by a change in the insured's identity." *Id.*; see *Elat, Inc.*, 654 A.2d at 505 (explaining that the rationale for allowing free assignment after a loss occurs is that assignment "does not alter, in any meaningful way, the obligations the insurer accepted under the policy"); see also *B.S.B. Diversified Co. v. Am. Motorists Ins. Co.*, 947 F. Supp. 1476, 1481 (W.D. Wash. 1996) (concluding that an insurer's risk does not increase upon assign-

ment of a claim when its duty to indemnify and defend relates to events occurring prior to assignment).

¶ 13. We see no reason to deviate from the general rule in this case. Green assigned NICO its payment rights under the two policies, but did not assign the policy itself. Moreover, when Green assigned its claims to NICO, the losses that triggered Ambassador's potential liability had already occurred. Green's insurance coverage from Ambassador was an occurrence-based policy, which means that "a claim is deemed to exist or arise at the time of the . . . incident, so long as the . . . incident occurred during the policy period, even if the claim is not reported until after the policy period expired." *McAlister v. Vt. Prop. & Cas. Ins. Guar. Ass'n*, 2006 VT 85, ¶ 6, 180 Vt. 203, 908 A.2d 455. The claims arose when parties were injured by Green's asbestos-containing products. See *Cent. Tablet Mfg. Co. v. United States*, 417 U.S. 673, 685 (1974) (holding that an insurer's obligation to pay arises upon occurrence of fire, even though liability may still be contested because "the fundamental contractual obligation that precipitates the transformation from tangible property into a chose in action consisting of a claim for insurance proceeds is fixed by the fire"); *St. Paul Fire & Marine Ins. Co.*, 543 P.2d at 149 (explaining that after the liability-causing event has occurred, clauses restricting assignment are not applicable).

¶ 14. We are not persuaded by liquidator's argument that the claims are not fixed because "the validity and extent of the underlying 'losses' are being made, settled, litigated or otherwise adjusted between the insured and third parties on an ongoing basis." Ambassador's potential liability to insure Green arose when parties were injured by Green's products. Although the exact amount of Ambassador's liability is not known because all of the suits against Green have not been reduced to distinct monetary awards, Ambassador's obligation to insure the risk has not been altered. See *Egger v. Gulf Ins. Co.*, 903 A.2d 1219, 1229 (Pa. 2006) (holding that risk to insurer triggered by the injury); see also *Travelers Cas. & Surety Co. v. U.S. Filter Corp.*, 870 N.E.2d 529, 541 (Ind. Ct. App.) ("[A] chose in action arises under an occurrence-based insurance policy at the time of the covered loss . . . . The lack of a specifically defined amount of recovery is not fatal to the determination that a chose in action exists."), *cert. granted*, 878 N.E.2d 222 (Ind. Dec. 20, 2007). Although Green did not know

the full amount of Ambassador's liability prior to assignment, the assignment did not alter this amount, however much it eventually may be.

¶ 15. Furthermore, there is simply no evidence for liquidator's assertion, and the trial court's conclusion, that "the assignments fundamentally change[d] the relationship between Ambassador and its insured," and resulted in an increased risk to Ambassador. Liquidator contends that where normally an insured has an incentive to manage its losses to the mutual benefit of itself and the insurer, NICO does not have the same motivation to minimize its losses as Green did and therefore there exists the possibility of greater liability on the claims. There is no merit to this argument. Green continues to manage and be liable for the claims. Therefore, Green's interest in resolving the claims was not altered by the assignment. Indeed, as part of its motion for summary judgment, NICO submitted an affidavit from Green's president that explained that the assignment to NICO had not altered the manner in which Green manages its asbestos-related liabilities. Green's president averred that Green has had "all the same incentives before and after its assignment to NICO to manage its asbestos liabilities responsibly and in the best interests of its shareholders, creditors, and insurers." Moreover, assignment of the payment rights to NICO cannot increase the value of the claims. While NICO undoubtedly wishes to maximize its recovery, NICO must still prove the extent of loss and the validity of the claims before it can receive any payment. The claims are worth what they are worth regardless of whether Green or NICO submits the request for payment to Ambassador. See *Egger*, 903 A.2d at 1228 (holding that once the original insured acted negligently, "the bargained-for risk was realized and was not changed by the assignment of rights").

¶ 16. Similarly, we do not find any support for the trial court's conclusion that Ambassador is exposed to an increased risk as a result of the assignment because Ambassador may now be subjected to direct actions by Green's asbestos claimants. See 8 V.S.A. § 4203(3) (allowing injured persons to maintain a direct action against an insurance company if the insured becomes insolvent or bankrupt). The possibility of a direct action by an injured party against Ambassador arose when Green filed for bankruptcy and was not affected by Green's assignment to NICO.

Thus, there was no increased risk to Ambassador that resulted from the assignment.

## II.

¶ 17. Having concluded that the consent-to-assignment clauses do not preclude assignment to NICO, we next consider NICO's argument that the trial court misinterpreted the statutory assignment of priorities. In the liquidation of a delinquent domestic insurer, the statute gives priority for distribution to the following classes of claims:

> (1) first priority: expenses of administration;
>
> (2) second priority: [employee compensation] . . . ;
>
> (3) third priority: claims for taxes and debts due to federal or any state or local government . . . ;
>
> (4) fourth priority: claims by policyholders, beneficiaries and insureds arising from and within the coverage of insurance policies and insurance contracts issued by the company, liability claims against insurers which are within the coverage of insurance policies and insurance contracts issued by the company, and claims presented by the Vermont Property and Casualty Insurance Guaranty Association or any similar organization in another state which represents covered claims . . . ; and
>
> (5) fifth priority: all other claims.

8 V.S.A. § 3595(b). Pursuant to the statutory scheme, liquidator originally classified Green's claims against Ambassador as priority four because they were "claims by . . . [an] insured[]." *Id.* § 3595(b)(4). Following assignment to NICO, liquidator reassigned the claims as priority five. The trial court agreed and concluded that under the plain language of the statute the claims were no longer priority four because the statute does not specifically list assignees of policyholders, beneficiaries or insureds under fourth priority. We disagree with the trial court's interpretation of the statute.

¶ 18. In construing a statute, we aim to implement the intent of the Legislature and will "presume the Legislature intended the plain, ordinary meaning of the statute." *Swett v. Haig's, Inc.*, 164 Vt. 1, 5, 663 A.2d 930, 932 (1995). "[W]e favor

interpretations of statutes that further fair, rational consequences, and we presume that the Legislature does not intend an interpretation that would lead to absurd or irrational consequences." *Wesco, Inc. v. Sorrell*, 2004 VT 102, ¶ 14, 177 Vt. 287, 865 A.2d 350 (quotations omitted). Further, when a statute encompasses an area previously governed by the common law, the intent to change common law rules "must be expressed in clear and unambiguous language." *Haig's*, 164 Vt. at 5, 663 A.2d at 932.

¶ 19. The common law generally presumes that an assignee takes whatever interest the assignor possessed. See *Hebert v. Jarvis & Rice & White Ins., Inc.*, 134 Vt. 472, 476, 365 A.2d 271, 273 (1976) (explaining that the assignee succeeds "only to such rights as were possessed by the assignor at the time of the assignment"). Thus, pursuant to the common law, when a creditor of an insolvent estate assigns a claim, the assignee is entitled to the same rights as the assignor, including the priority of payment. As the Restatement explains, "[a]n assignee is entitled to priority of payment from the obligor's insolvent estate to the extent that the àssignor would have been so entitled in the absence of assignment." Restatement (Second) of Contracts § 340(1) (1981).

¶ 20. The question then is whether the statute overrides the common law in this area or instead preserves an assignee's common law right to succeed to the same priority status as the assignor. Looking to the plain language of the statute, liquidator argues that because assignees are not specifically included in the list of priority four claimants, the Legislature intended to exclude them.[5] We have explained that although rules of statutory construction may be helpful, they may be "discarded when they do not further a statute's remedial purposes." *In re Elec. Indus. Alliance*, 2005 VT 111, ¶ 9 (quotations omitted). Although the plain

---

[5] Liquidator also argues that because the statute enumerates guaranty associations as priority four claimants, the Legislature intended to exclude all other types of assignees. We do not find that the mention of this one specific type of assignee compels a result that the Legislature intended to exclude all other assignees, given the common-law principles securing an assignee's right to succeed to an assignor's priority status, see *In re Elec. Indus. Alliance*, 2005 VT 111, ¶ 9, 179 Vt. 539, 889 A.2d 729 (mem.) (explaining that "the special language applicable to one item in a list may be to emphasize its availability for that item, and not to exclude its availability for other items"), and the illogical result of such an interpretation, explained more fully below. *Infra*, ¶¶ 21-23.

language of the statute does not include assignees under priority four, the statute also does not indicate that it intends to override or displace common-law principles granting assignees the right to retain the priority status of the assignor. See *Haig's*, 164 Vt. at 5, 663 A.2d at 932 ("Words of doubtful meaning do not change common law rules; the intent to do so must be expressed in clear and unambiguous language."). While it is true that priority claim status is set by statute and that the common law cannot supplant the statute, in this case, the common law does not conflict with the statute. We conclude that the Legislature did not intend to override the common law, given that an interpretation of the statute preserving common-law rights is the most reasonable and is consistent with the statute's overall purpose.

■ ¶ 21. Excluding assignees from retaining the priority status of insureds would severely limit an insured's ability to assign a claim against an insolvent insurer to a third party. Under liquidator's interpretation of the statute, the assignee would become merely a general creditor and, thus, in most cases, would receive little or no payment for the claim, as in this case. This would hamper an insured's ability to receive immediate monetary payment through assignment for a valid claim without waiting for resolution of the claim through the liquidation process; a process liquidator concedes can take decades. See *In re Missionary Baptist Found. of Am., Inc.*, 667 F.2d 1244, 1247 (5th Cir. 1982) (explaining that "the judicial policy to allow priority to assigned wage claims was designed for the protection of the worker, who is thereby enabled to liquidate his claim against the bankrupt more advantageously"). Without a more explicit indication, we will not presume that the Legislature intended this result. We conclude that the statute's intent is not to override the common law and exclude assignees of insureds from the class of claims entitled to priority four status.

■ ■ ¶ 22. Furthermore, our interpretation of the statutory language is most consistent with the overall purpose of the priority statute. See *In re Margaret Susan P.*, 169 Vt. 252, 262, 733 A.2d 38, 46 (1999) ("We interpret the statute as a whole, looking to the reason and spirit of the law and its consequences and effects to reach a fair and rational result."). When evaluating the priority of claims in during liquidation, the critical question is the character of the claim, not the identity of the claimant. The

character of Ambassador's liability was fixed before Green assigned its claims to NICO, and the assignment did not alter the source of the claims or the amount Ambassador owed under the claims. Because assignment did not alter the character of the claim, there is no logical reason to change the priority status of the claim. See *Wesco*, 2004 VT 102, ¶ 14 (interpreting statute to favor rational result).

¶ 23. The United States Supreme Court reached a similar result when faced with the question of whether workers' claims for wages that were assigned to a third party retained their priority status under the bankruptcy code. *Shropshire, Woodliff & Co. v. Bush*, 204 U.S. 186 (1907). At the time, the bankruptcy code gave priority to "wages due to workmen, clerks, or servants." *Id.* at 188 (quotation omitted). When the assignee holding the workers' claims attempted to receive payment, the trustees of the bankrupt employer argued that the claims were not entitled to priority status because assignees were not enumerated in the statute. The Court rejected this "plain language" argument and held that the status of the claims had not been altered by the assignment. *Id.* at 189. In reaching this decision, the Court explained that "the plain words of the statute . . . [were] merely descriptive of the nature of the debt to which priority is given." *Id.* The Court further explained:

> When one has incurred a debt for wages due to workmen, clerks, or servants, that debt, within the limits of time and amount prescribed by the act, is entitled to priority of payment. The priority is attached to the debt and not to the person of the creditor; to the claim and not to the claimant. The act does not enumerate classes of creditors and confer upon them the privilege of priority in payment, but, on the other hand, enumerates classes of debts as "the debts to have priority."

*Id.* Thus, the Court allowed the assignee to retain the priority status of the workers' claims. *Id.*

¶ 24. Similarly, our priority statute is concerned with establishing priority for types of claims, not for certain classes of individuals asserting those claims. The claims at issue in this case fit the description for priority four claims described in the statute; they are claims of an insured and arise from coverage under an

insurance contract. 8 V.S.A. § 3595(b)(4) (granting priority four status to "claims by . . . insureds arising from . . . insurance policies"). These characteristics are not altered merely because NICO, and not Green, is now entitled to payment for the worth of the claims. Therefore, we conclude that the claims Green assigned to NICO retained their status as priority four claims.

*Reversed and remanded for further proceedings consistent with this opinion.*