2011 VT 112

**Pike PORTER v. AT&T MOBILITY, LLC**

[35 A.3d 1002]

No. 10-308

¶ 1. September 19, 2011. Defendant AT&T Mobility, LLC appeals the trial court's denial of its motion to compel arbitration. AT&T claims the trial court erred by ruling that AT&T had not been assigned plaintiff Pike Porter's cell phone contract before sending him unsolicited text messages and erred in failing to hold an evidentiary hearing on this issue. AT&T also argues that even if Porter's claims arose before AT&T purchased his contract, the trial court erred as a matter

_____

of law in holding that AT&T cannot enforce the binding arbitration agreement in Porter's original cell phone contract. We affirm.

¶ 2. The basic facts are uncontested. In July 2007, Unicel entered into a merger agreement with Verizon Wireless. In order to receive state and federal approval for this merger, Verizon agreed to sell certain Unicel assets to AT&T. In December 2008, AT&T purchased around 100,000 to 150,000 contracts between Vermont consumers and Unicel from Verizon. By December 22, 2008, AT&T had completed the acquisition of Unicel's Vermont assets. As part of the transition from Unicel's network to AT&T's network, Unicel customers were informed, beginning in early 2009, that they had become AT&T's customers. AT&T further informed these "legacy" Unicel subscribers that their Unicel service would shut down on December 22, 2009, and that they had the option of subscribing with AT&T. Much of this communication was accomplished through text messages and letters.

¶ 3. Porter entered into a contract with Unicel for wireless service in July 2007 in Burlington. In March 2009, he received three unsolicited text messages from AT&T. Shortly thereafter, the Vermont Office of the Attorney General sent AT&T a letter informing AT&T that its messages to Porter had violated federal and state "do not call" regulations. Over the course of the next several months, Porter continued to receive unsolicited text messages from AT&T. During these same months, a representative of AT&T's Office of the President spoke with Porter and assured him his number would be placed on AT&T's "do not call" list. This same representative also sent the Attorney General's Office two faxes, roughly a month apart, which both stated: "AT&T reviewed Mr. Porter's complaint and found Mr. Porter is a non-AT&T customer. AT&T added Mr. Porter's mobile telephone number to the Do Not Contact Me list with AT&T." Por-

ter continued to receive text messages after these faxes were sent. In November 2009, Porter signed a contract for wireless service with AT&T.

¶ 4. On November 18, 2009, Porter filed suit in superior court alleging AT&T's unsolicited text messages violated 47 U.S.C. § 227 and the Federal Communications Commission's rules that govern telephone solicitations and unsolicited advertisements. He demanded $476,000 in damages.[1] In response, AT&T filed a motion to compel arbitration and dismiss the complaint, relying on the "Right to Elect Arbitration" clause contained in Porter's contract with Unicel. AT&T submitted several documents in support of the motion, including a copy of Porter's original Unicel contract containing the arbitration clause and a supporting affidavit from one of its employees. The contract, dated in July 2007, stated that Porter agreed to "have any claim, dispute or controversy . . . of any kind . . . arising out of or relating to . . . any prior or future dealings between" Porter and Unicel or its "assignees" or "successors" "resolved by binding arbitration." Porter had also specifically indicated he had read this arbitration clause by signing his initials. The employee affidavit averred that Porter "became a customer of [AT&T] in November 2009." AT&T argued that because Porter was beholden to the arbitration agreement, AT&T owned his Unicel contract, and his claims fell within the agreement's language, he was required to arbitrate. The trial court denied AT&T's motion based on "the undisputed fact [contained in AT&T's affidavit] that Porter did not become a customer of AT&T" until November 2009, after it sent the offending text messages. The court also noted that

_____

[1] In February 2010, Porter filed a second suit under substantially the same facts alleging violations of Vermont's Consumer Fraud Law, 9 V.S.A. § 2464a, and demanding $110,000 in damages. The parties have since settled this claim.

the arbitration agreement could not bind Porter "with regard to events between him and AT&T that took place at a time when his only contract was with Unicel, not AT&T."

¶ 5. In response, AT&T filed a motion to amend the findings and order and to reconsider the judgment. AT&T argued that it had acquired Unicel's assets in the Vermont market — including Porter's account with Unicel — in December 2008. In support of this proposition AT&T attached several press releases about the Unicel purchase and a copy of the "Assurance of Discontinuance," the written agreement, approved by the Vermont Attorney General's office, outlining AT&T's purchase of Unicel's assets. The press releases stated that as of December 22, 2008, AT&T "completed acquisition of the Vermont assests of [Unicel]" and that it "acquired some former [Unicel] properties . . . including licenses, network assets and subscribers, in the Burlington, Vt. metropolitan service area." The Assurance document explained that Verizon had agreed "to divest its wireless businesses in six cellular market areas, including all of Vermont" and this agreement "was incorporated into a Final Judgment entered on April 23, 2009." It further explained that "pursuant to a December 2, 2008, Purchase Agreement, . . . [AT&T purchased] certain Unicel assets, including between 100,000 and 150,000 contracts between Vermont Consumers and Unicel." Upon this evidence the trial court again denied AT&T's motion to compel arbitration because the newly submitted materials "state that AT&T acquired '100,000 and 150,000 contracts between Vermont Consumers and Unicel,' but [do] not establish that the acquisition included *all* Vermont Unicel contracts, or Mr. Porter's in particular." AT&T appealed. See 12 V.S.A. § 5681(a)(1) (permitting direct appeal from "an order denying an application to compel arbitration").

¶ 6. AT&T's central claim on appeal is that the trial court erred in holding that Porter's Unicel contract had not been assigned to AT&T until November 2009 because the evidence AT&T provided suggested that it acquired all of Unicel's contracts in December 2008. AT&T posits that the contract at issue "evidences 'a transaction involving commerce,' " and as such this Court should presume that the Federal Arbitration Act (FAA) governs this dispute. *Little v. Allstate Ins. Co.*, 167 Vt. 171, 172, 705 A.2d 538, 540 (1997) (quoting 9 U.S.C. § 2). Porter does not challenge this assertion, and we assume without deciding that this is the case.[2] Under the FAA, a court reviewing the denial of a motion to compel arbitration does so de novo, under a standard akin to a summary judgment motion. See, e.g., *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (noting courts apply "standard similar to that applicable for a motion for summary judgment" when addressing motions to compel arbitration); *Commonwealth v. Philip Morris Inc.*, 864 N.E.2d 505, 511 (Mass. 2007) (determining, under FAA, that review of denial of motion to compel should be de novo).

¶ 7. Under this standard, we must determine whether AT&T met its burden in proving it was assigned Porter's contract before sending him the offending text. See *In re Mercury Constr. Corp.*, 656 F.2d 933, 939 (4th Cir. 1981) (noting that party seeking arbitration must establish making of arbitration agreement). AT&T highlights four pieces of evidence it sub-

---

[2] We take no position on whether the standard of review would be different if the trial court had held a hearing and taken evidence on the issue of formation rather than basing its ruling on the documents defendant submitted. Cf., e.g., *Stenzel v. Dell, Inc.*, 2005 ME 37, ¶ 6, 870 A.2d 133 ("We review a trial court's decision on a motion to compel arbitration for errors of law and for facts not supported by substantial evidence in the record." (quotation omitted)).

mitted along with its motion to amend and reconsider as "undisputed" proof that it purchased Porter's contract in December 2008. First, AT&T points to the "Assurance of Discontinuance" it filed with the Vermont Attorney General's office. This document states that Verizon agreed "to divest its wireless businesses in six cellular market areas, including all of Vermont." It also included a purchase agreement dated December 2, 2008 concerning "certain Unicel assets, including between 100,000 and 150,000 contracts between Vermont Consumers and Unicel." This document does not establish that Porter's contract was one of the 100,000 to 150,000 contracts sold, nor does it suggest that "certain Unicel assets" include all of the wireless contracts Unicel held in Vermont.

¶ 8. AT&T's remaining evidence is equally unpersuasive. It suggests that two press releases also support its contention, yet neither state that Unicel assigned *all* of its Vermont wireless contracts to AT&T in December 2008. Likewise, AT&T relies on an affidavit — the only sworn document provided — from the custodian of its legacy contracts, who stated that Porter's contract was among those acquired during the Unicel merger. Yet the only contract date the affidavit provides is unequivocal: "[Porter] became a customer of [AT&T] in November 2009." Cf. *U.S. Bank Nat'l Ass'n v. Kimball*, 2011 VT 81, ¶ 16, 190 Vt. 210, 27 A.3d 1087 (affirming dismissal of foreclosure action because plaintiff bank filed "contradictory and uncertain documentation" in support of its ownership claim such that "there was no evidence to show that [the bank] was a holder of the note at the time it filed the complaint."). Finally, AT&T points to an undated letter it sent Porter informing him that AT&T had acquired his Unicel account. It is unclear how an undated letter helps clarify the date when AT&T took over Porter's account. Nowhere, in any of its submissions to the trial court, did AT&T provide clear evidence, in any form, that it was assigned Porter's contract or that it purchased all of the contracts of Unicel's Vermont customers before November 2009. Its argument to the contrary is little more than a "bald assertion." *In re Shenandoah LLC*, 2011 VT 68, ¶ 17, 190 Vt. 149, 27 A.3d 1078 (dismissing plaintiff's argument that its affidavits supported judgment in its favor where documents provided merely conclusory facts).

¶ 9. As a corollary to this main argument, AT&T also claims that once the trial court discerned that there was ambiguity as to when Porter's contract was assigned to AT&T, the court should have held a hearing on that issue. In support of this argument, it points to the FAA and the Vermont Arbitration Act, which both direct a court to summarily determine whether the making of a contract is in dispute. See 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof."); 12 V.S.A. § 5674(c) ("When the existence or validity of an agreement to arbitrate . . . is in substantial and bona fide dispute, the court shall proceed summarily to the determination of the issue."). What AT&T fails to explain is how it was prejudiced by the lack of this hearing. After the trial court denied its motion to compel, AT&T submitted additional evidence along with its motion to reconsider. The court expressly considered this new evidence and denied this second motion, finding insufficient evidence to support AT&T's contention, not an ambiguity in the contract. What AT&T appears to request is a third bite at the apple. This we shall not permit.

¶ 10. Finally, AT&T argues that, as a matter of law, it can still enforce the arbitration agreement contained in the contract, even if the exact date of assignment was not fixed, because AT&T is now the undisputed assignee of Unicel and thus can step into Unicel's shoes and

invoke all of the contractual rights that Unicel would have had. It bases this assertion on contract law and the text of the arbitration clause, which reads, in part:

(2) BINDING ARBITRATION: (a) RIGHT TO ELECT TO ARBITRATE: We (including our assignees, . . . predecessors and successors) or you may elect to have any claim, dispute or controversy ("Claim") of any kind (whether in contract, tort or otherwise) arising out of or relating to your Service or this agreement . . . , any goods or services provided to you, any billing disputes between you and us, or any prior or future dealings between you and us resolved by binding arbitration.

AT&T claims that as an "assignee" or "successor" of Unicel, a party to the original contract, it has the right to elect to arbitrate a claim, even one arising out of conduct it may have undertaken before it was assigned the contract, because such a claim involves a "prior dealing."

¶ 11. We need not comb volumes of law to answer this request in the negative. In reviewing a contract, we "give effect to the intent of the parties as it is expressed in their writing." *Southwick v. City of Rutland*, 2011 VT 53, ¶ 4, 190 Vt. 106, 35 A.3d 113. The key provision of the contract states that claims "arising out of . . . any prior or future dealings between you and us [may be] resolved by binding arbitration." While AT&T, as Unicel's assignee and successor, certainly took "whatever interest the assignor possessed" when it assumed Porter's contract, *In re Ambassador Ins. Co.*, 2008 VT 105, ¶ 19, 184 Vt. 408, 965 A.2d 486, that "interest" did not include the ability to compel arbitration between Porter and AT&T. At the time AT&T sent Porter the offending text messages, AT&T was not — based on the evidence it submitted — a party to the contract. Unicel could not have forced Porter to arbitrate his claims against an unrelated third party, and AT&T does not so argue. The "prior dealings" referenced in the clause refer to earlier business transactions between the contracted parties. See Black's Law Dictionary 457 (9th ed. 2009) (defining "deal" as "[t]o transact business with (a person or entity)"). Plainly the interaction between AT&T and Porter was not of this nature. AT&T's citations on this point are unavailing.

*Affirmed.*