2009 VT 88

**In re HAMM MINE ACT 250 JURISDICTION (Jurisdictional Opinion # 2-241)**

[980 A.2d 286]

No. 08-249

¶ 1. August 20, 2009. This case arises as the result of flooding allegedly caused by the failure of past operators of an openpit talc mine to abide by the conditions of an Act 250 permit. Luzenac America, Inc. and U.S. Talc Co. (Luzenac) appeal the Environmental Court's determination that the mine continues to be subject to Act 250 jurisdiction after mine operations ceased and the Act 250 permit expired. We affirm.

¶ 2. After purchasing land from the Hamm family in 1981, Vermont Talc obtained an Act 250 permit from the District 2 Environmental Commission the following year to operate a talc mine on the property. The 1982 permit stated that the permittee, as well as its assigns and successors, were obligated "to complete and maintain the project only as approved by the district commission in accordance with" the permit conditions, its findings and conclusions, and the permittee's

plans and exhibits that were stamped as approved by the commission. The permit explicitly prohibited any changes in the project "without the written approval of the District Environmental Commission."

¶ 3. The findings and conclusions that accompanied the 1982 permit endorsed, among other things, the permittee's plan to pump water from the mine into a holding pond on the southeast corner of the property that would settle out solids and allow gradual drainage. To ensure compliance with criterion four of Act 250, 10 V.S.A. § 6086(a)(4), the permit stated that "[t]here will be no unreasonable soil erosion or effects on the capacity of the land to hold water." The permit further noted that the planned "[p]ermanent erosion controls consist of culverts, rip rap, a sedimentation pond and seed and mulch." Another finding pertaining to the extraction of earth resources stated that "[t]he plan for opening the mine is the final grade for the closing of the mine," and that "[t]he project is planned to have shallow slopes to the water level of a pond in the open portion of the mine." The finding further noted that the pond "can be used for recreation or for a fire pond." The permit explicitly stated that it would expire on October 15, 2002, unless extended by the district commission.

¶ 4. For reasons that are not entirely clear, the permittee commenced construction of the pond in the southeast corner of the property as approved by the permit, but abandoned its use early on and instead constructed two sedimentation ponds northwest of the mine at a higher elevation. It is undisputed that the permittee never sought or obtained from the district commission a permit amendment allowing either relocation of the approved sedimentation pond or omission of erosion control structures associated with the pond.

¶ 5. Luzenac is the permittee's successor in interest. Between 1984 and 1995, the original permittee or Luzenac filed several applications for permit amendments, none of which referenced either the abandonment of the sedimentation pond and discharge structures originally approved in the 1982 permit or the replacement structures actually constructed and used in the operation of the mine. In November 1995, the district commission granted Luzenac's permit application authorizing it to expand the mine's existing overburden disposal area — the area where waste rock fill was placed. One of the permit conditions required Luzenac to reclaim the overburden disposal area by October 2002, as outlined in its plan. Luzenac stated in its application for the 1995 permit amendment that "[o]verall site reclamation is pending designation of mine closure date. Reclamation of overburden disposal area involves grading and revegetation." Mine operations ceased in 1997.

¶ 6. Between 1997 and 2002, Luzenac monitored the gradual filling of the pit with water that resulted from the cessation of pumping operations. In October 2002, Luzenac informed the district commission of its full compliance with permit conditions and outlined its plans to allow the permit to expire, complete reclamation, and sell the property. That same month, Luzenac sold the property to a couple who participated in the later proceedings before the district commission and the Environmental Court but not the instant appeal. In 2003, the pit began overflowing onto the adjoining property of James McCandless, the successor trustee of appellee B.W. McCandless Trust. The Environmental Court found that flooding from the mine contributed to turning a portion of the McCandless property into a wetland that prevented productive use of the land.

¶ 7. In response to the new owners' request for a jurisdictional opinion, the district coordinator ruled that the mine remained subject to Act 250 jurisdiction even though mine operations had ceased

and the Act 250 permit had expired. The new owners and Luzenac appealed that determination to the Environmental Court. The court reaffirmed the district coordinator's determination, ruling that the failure of the mine operators to abide by the terms of the original permit by seeking a permit amendment before removing discharge structures and substituting unapproved sedimentation ponds for the one designated in the approved plan amounted to development activities that subjected the mine to continuing Act 250 jurisdiction, despite the cessation of mine operations and the expiration of the Act 250 permit. The court also rejected Luzenac's argument that the district commission was estopped from asserting Act 250 jurisdiction because it was aware of the unpermitted changes when it approved later permit amendments.

¶ 8. On appeal, Luzenac argues that (1) any permit violations were causally unrelated to the alleged damage from the flooding and thus could not be the basis for continued Act 250 jurisdiction; (2) the company reclaimed the mine as required by the permit conditions, and thus there was no further development activity to trigger Act 250 jurisdiction; (3) under the circumstances of this case, the district commission should be estopped from asserting Act 250 jurisdiction; and (4) the Environmental Court erred in making certain findings that have the "propensity to cause legal mischief." Both the adjoining landowner and the State have filed briefs asking this Court to affirm the Environmental Court's decision.

¶ 9. We defer to the Environmental Court's construction of land-use permit conditions. *Agency of Natural Res. v. Weston*, 2003 VT 58, ¶ 16, 175 Vt. 573, 830 A.2d 92 (mem.). We will not disturb the court's factual findings unless, viewing the evidence most favorably to the prevailing party, the findings are clearly erroneous. *Timberlake Assocs. v. City of Winooksi*, 170 Vt. 643, 645, 756 A.2d 774,

776 (2000) (mem.). Thus, as long as there is some credible evidence to support a finding, we will not disturb it, "even if it is contradicted by substantial evidence." *Id.* at 645, 756 A.2d at 776-77. Further, we will uphold the court's legal conclusions "if reasonably supported by the findings." *Clayton v. Clayton Invs., Inc.*, 2007 VT 38A, ¶ 9, 182 Vt. 541, 929 A.2d 713 (mem.).

¶ 10. With these standards in mind, we address Luzenac's first claim of error, which goes to the heart of this case. The gist of this argument is that there is no causal relationship between the drainage problems at the northeast corner of the mine and the permit violations associated with relocating the sedimentation ponds in the mid-1980s. According to Luzenac, the sedimentation ponds and associated structures related only to the operational phase of the mine and were never intended to address drainage issues after the mine closed. Luzenac insists that the approved sedimentation pond southeast of the quarry was to receive only water pumped from the bottom of the pit during the operation of the mine, and in fact could not drain water from the pit after the operational pumping ceased. On this point, Luzenac disputes the Environmental Court's finding that the southeast sedimentation pond was intended to accept overflow waters after closure of the mine.

¶ 11. At trial, the parties hotly debated, and the Environmental Court probed with its own questions, whether the approved sedimentation pond and associated structures were intended for post-operational drainage and whether permit violations associated with the abandonment of that pond were causally related to the later drainage problems. The court ultimately found in favor of the State and the adjoining property owner on both of these points before ruling that the district commission retained jurisdiction over the site. Noting the explicit findings in the 1982 permit that "[t]here

will be no unreasonable soil erosion or *effects on the capacity of the land to hold water*," and that "*[p]ermanent* erosion controls consist of culverts, rip rap, *a sedimentation pond and seed and mulch*" (emphasis added), the court concluded that the former finding comported with assuring compliance with criterion four of Act 250, and that the "reference [in the latter finding] was to the specific sedimentation pond and discharge structures referenced in the originally approved site plan."

¶ 12. In support of its claim that the 1982 permit never anticipated that the original sedimentation pond would serve as a post-operational drainage area, Luzenac vigorously questioned and cross-examined expert witnesses as to whether the original sedimentation pond could have served as a drainage area without using the operational pumping equipment. On this point, appellees' expert witness acknowledged that, as originally designed, the rim of the mine was four feet lower than the highest water elevation for the sedimentation pond, and that water was to be received into the pond by pumping during the mine's operational phase. But the expert further explained that the rim of the mine was two feet higher than both the bottom of the sedimentation pond and the spillway outlet pipe called for in the design submitted with the original application. The expert denied that it was speculative to say that the original sedimentation pond and outlet pipe could have been used for drainage without the operational pumping system. Neither Luzenac's expert nor any other witness countered this testimony.

¶ 13. Given this record, we conclude that there was adequate support for the Environmental Court's findings that the 1982 permit referenced the originally approved sedimentation pond and associated structures as part of the conditions pertaining to erosion control and the land's capacity to hold water, and that the replacement ponds were relocated to a higher elevation that made them "useless in handling the flow of water subsequent to active mining operations." The 1982 permit plainly refers to the approved sedimentation pond in the context of permanent erosion and flood control. As noted by the Environmental Court, the findings specifically stated that the permittee "agreed to come back for an amendment if there is any work that will change the quantity or quality of the runoff in the direction of" the McCandless property. Expert testimony indicated that the pond and associated outlet pipe could have been useful in that respect after closure of the mine.

¶ 14. Luzenac contends that the approved sedimentation pond had run "afoul of State pollution regulators," and that it is entirely speculative to assume that the Agency of Natural Resources would have approved the original sedimentation pond as part of a permanent drainage system. The Environmental Court found that it was unclear why the permittee abandoned the original sedimentation pond and discharge structures. To the extent there is any speculation on the permittee's ability to implement the approved plan, it is the result of the permittee's failure to make a record on the issue and obtain approval for relocation of the sedimentation ponds. In short, Luzenac has failed to demonstrate that the record does not support the Environmental Court's conclusion that a causal connection existed between the permit violations and the post-operational drainage problems.

¶ 15. We also acknowledge, but reject, Luzenac's suggestion that the flooding on the McCandless property that led to these proceedings was caused by a heavy rainstorm in August 2003 or a preexisting stream, rather than water runoff from the overflowing former mine. The Environmental Court expressly recognized that the most serious soil erosion damage co-

incided with the August 2003 rainstorm. It found additionally, however, that the McCandless fields "were not so saturated prior to the mine overflow," that "the wetlands appeared after the mine overflow," and that "the overflow of water from the former mine . . . contributed to the establishment of the wetlands." On appeal, Luzenac has failed to demonstrate that the court's findings, which establish a causal connection between the overflow from the mine and the water damage to nearby property, are clearly erroneous. Indeed, the findings are supported by substantial evidence, including the testimony of the affected property owner.

¶ 16. Luzenac's second related argument is that it could not have engaged in any development activity to trigger continuing Act 250 jurisdiction, as the Environmental Court found, because it abided by the only explicit condition concerning reclamation in the 1982 permit as well as the reclamation conditions in the 1995 amended permit. According to Luzenac, given this fact and the lack of a causal connection between the drainage problems and any permit violations associated with the relocation of the sedimentation ponds, the Environmental Court is in effect ruling that developmental activity will be imputed anytime a post-operational quarry overflows onto neighboring properties, even if the quarry operators complied with all of the reclamation conditions and the Act 250 permit expired. Luzenac contends that such a ruling violates this Court's holding in *In re Huntley*, 2004 VT 115, 177 Vt. 596, 865 A.2d 1123 (mem.).

¶ 17. We disagree. In *Huntley*, we reviewed a decision of the Environmental Board holding "that the Huntleys' mine and associated property remained subject to Act 250 jurisdiction even though the site had been fully reclaimed, and its former permit had expired." *Id.* ¶ 1. We reversed, holding that "the land is no longer subject to Act 250 jurisdiction absent some activity to trigger the statute's application." *Id.* In explaining this holding, we noted the undisputed fact that "the Huntleys had ceased mining operations, and fully reclaimed and rehabilitated the property *in accordance with the permit requirements.*" *Id.* ¶ 3 (emphasis added). We concluded that, *"under the circumstances in this case*, Act 250 jurisdiction ended when the permit expired." *Id.* ¶ 6 (emphasis added). We reasoned that once the Huntleys ceased the mining operation "and reclaimed the land," they were no longer "conducting any activity that constitutes development as defined by Act 250," and thus the Board had no enforcement authority to assert jurisdiction. *Id.* ¶ 9.

¶ 18. The situation here is easily distinguishable. Contrary to the Board's finding in *Huntley*, in this case the Environmental Court found that Luzenac and its predecessor had not complied with all of the permit conditions, including ones related to reclamation. Luzenac disputes these findings, but we have upheld herein the court's conclusions that there were permit violations associated with the relocation of the sedimentation ponds and that those violations were causally connected to the post-operational drainage problems. We also reject Luzenac's contention that its compliance with the conditions of the 1995 permit amendment demonstrated that it had satisfied all reclamation conditions. Luzenac's 1995 permit amendment application addressed its interest in expanding the existing overburden disposal area. The application noted that "[r]eclamation of overburden disposal area involves grading and revegetation," but also explicitly stated that "[o]verall site reclamation plan is pending designation of mine closure date." Luzenac failed to demonstrate, however, that it later submitted an overall reclamation plan or petitioned for a certification of compliance with the terms and conditions of its permits, as permit-

ted by Environmental Board Rule 37. Accordingly, we concur with the Environmental Court's determination that *Huntley* is inapplicable in this case and that the district commission has continuing jurisdiction to enforce the ongoing permit violations and ensure that the property is fully reclaimed.

¶ 19. To be sure, during the instant proceedings, Luzenac was not engaged in ongoing development in the sense that it was continuing to construct the unpermitted sedimentation ponds or associated structures. Indeed, Luzenac had ceased all operations and allowed its Act 250 permit to expire, indicating that it had fully reclaimed the site and did not intend to renew the permit. But these facts do not alter the reality that the mine itself is a development permitted under Act 250, and that the development was not constructed or reclaimed as permitted, and as a result is having a negative impact on neighboring property, in violation of Act 250. Under these circumstances, the Board retains jurisdiction with regard to its enforcement authority over the development.

¶ 20. Luzenac argues, however, that the district commission should be estopped from asserting jurisdiction over the mine because the commission surely must have been aware of the relocation of the sedimentation ponds and in fact issued an amended permit that allowed Luzenac's predecessor to expand the pit opening into an area where the original pond would have been located. In Luzenac's view, allowing continued Act 250 jurisdiction under the circumstances of this case would violate this Court's holding in *In re Tekram Partners*, 2005 VT 92, 178 Vt. 628, 883 A.2d 1160 (mem.).

¶ 21. Again, we disagree. In *Tekram*, we held that the exclusive remedy set forth in 24 V.S.A. § 4472(a) for contesting local zoning decisions precluded the City of South Burlington from enforcing alleged violations of a site plan three years after the City's zoning administrator issued a certificate of occupancy with respect to the entire project. 2005 VT 92, ¶ 2. In so holding, we noted that the zoning administrator had a "duty" imposed by the City's own zoning regulations "to make a final inspection of the premises and issue a certificate of occupancy" only if the project was found to conform with the provisions of the ordinance. *Id.* ¶ 4. We stated that when "§ 4472(a) is at issue, the nature of the disputed design features as they pertain to the [site] plan becomes irrelevant," *id.* ¶ 13, in that the City's issuance of the certificates of occupancy "had the effect of approving the disputed design features," *id.* ¶ 9.

¶ 22. In contrast, this case does not involve the exclusivity provision set forth in § 4472(a), and, as the Environmental Court noted, the district commission's only duty was to issue permits or permit amendments based on the information supplied by the permittee, not to visit the mine to assure that the permittee or its successor was complying with all of the permit conditions. Indeed, as explicitly stated in the permit at issue here, it is the duty of the permittee and successors to obtain approval from the district commission for any changes to the originally approved site plan. The Environmental Court rejected the notion that permittees can obtain what amounts to de facto authorization for site plan changes as long as those changes are apparent from a permit application, even if the permittees do not seek or obtain a permit amendment for the changes.[*] We concur. As the

---

[*] Luzenac emphasizes that the evidentiary skirmish over which plans were before the district commission in connection with the amendment requests — although correctly decided in its view — "was palpable in the decision." To the extent this is a claim of error, it cannot be grounds for action by this Court because Luzenac was able to get before the court

Environmental Court noted, Luzenac failed to cite any case law to support such a holding, which potentially could encourage permittees not to seek permit amendments for site plan changes in the hopes that the district commission would not notice or challenge the changes.

¶ 23. As for the doctrine of estoppel, the Environmental Court opined that the facts of this case suggested, if anything, estoppel against Luzenac, given the considerable evidence that, as early as 1995, Luzenac was aware of the potential for post-operational flooding and in fact made statements to the complaining adjoining property owner and to the Town of Windham with regard to measures it would take to address the problem. As noted, Luzenac did not seek certification that its development project had been completed as approved, which, if granted, would have estopped assertions, absent claims of fraud or misrepresentation, that the company had not fully complied with permit conditions. In any event, Luzenac does not attempt to, and cannot, meet the stringent standard of showing estoppel against the government in this case. See *In re Griffin*, 2006 VT 75, ¶ 18, 180 Vt. 589, 904 A.2d 1217 (mem.) (noting that estoppel will be applied against government entity "only in rare instances" where "the elements of estoppel are met and the injustice that would result from denying the estoppel outweighs the negative impact on public policy that would result from applying estoppel" (citation omitted)). Luzenac does not, and cannot reasonably, claim that it was ignorant of the unpermitted changes in the site plan or that it could rely on permits that did not address development for which neither Luzenac nor its predecessor sought

the plans upon which it relied. The court's ruling instead was that the existence of the plans did not establish a permit amendment, a ruling we have affirmed in the text.

or obtained approval. See *id.* (setting forth elements of estoppel).

¶ 24. Finally, Luzenac asks this Court to strike findings which it "contested because of their propensity to cause legal mischief." Without citing the specific findings or arguing that they were clearly erroneous, Luzenac generally objects to the Environmental Court's description of the northeast corner of the mine as an earthen dam with a spillway, its treatment of alleged representations made by the company as to monitoring and pumping mine water, and its discussion of Luzenac's failure to disclose potential post-operational drainage issues with the couple who purchased the mine from the company. We decline to strike any findings related to these subjects insofar as Luzenac has not demonstrated that they are clearly erroneous. See *Timberlake Assocs.*, 170 Vt. at 645, 756 A.2d at 776 (noting that we will not disturb trial court findings "unless, taking the evidence in the light most favorable to the prevailing party, they are clearly erroneous").

*Affirmed.*