2010 VT 42A

# In re Village Associates Act 250 Land Use Permit

[998 A.2d 712]

No. 09-171

Present: **Reiber, C.J., Dooley, Johnson, Skoglund, and Burgess, JJ.**

Opinion Filed June 18, 2010

*Heather Rider Hammond* of *Gravel and Shea*, Burlington, for Appellant.

*William H. Sorrell*, Attorney General, and *Diane E. Zamos*, Assistant Attorney General, Montpelier, for Appellee.

¶ 1. **Johnson, J.** Appellant/developer appeals imposition of an off-site mitigation fee assessed pursuant to 10 V.S.A. § 6086(a)(9)(B)(iv) because of the presence of 10.85 acres of "primary agricultural soils" on the site of a proposed affordable

housing development.[1] Developer contends that the Environmental Court erred by refusing to consider the cost of removing trees from the land in assessing whether it should be classified as primary agricultural soils. Because we agree with developer that the Environmental Court erred in its interpretation of the statute, we reverse and remand to the Environmental Court for a decision consistent with the standard set forth in this opinion.

¶ 2. The relevant facts are as follows. Developer proposed to construct a multi-unit affordable housing development known as Brookside Village on a 25.8-acre parcel of land located in the towns of Colchester and Winooski. The property is bordered by the Winooski River to the west and Morehouse Brook to the north. The property is adjacent to a grid of residential streets to the east. Several miles north of the property, however, there are several agricultural operations, including a dairy farm, an equine operation, and a small fruit and vegetable stand. There are currently access roads leading to the parcel from two residential streets (West Street and Hickok Street) located on the eastern side of the land. In addition, there are a total of 300 feet of frontage onto Malletts Bay Avenue, located on the northeast corner of the parcel. The project contemplates future access to the development through two existing residential lots along Malletts Bay Avenue.

¶ 3. Developer applied for and was ultimately granted an Act 250 permit by the District 4 Environmental Commission (DEC). Developer conceded that the project site contained 12.88 acres of "primary agricultural soils," of which 2.03 acres were located such that they were unusable, leaving a total of 10.85 acres of primary agricultural soils. The 10.85 acres at issue currently contain "a healthy eastern woodland, including some stands of mature trees as well as regenerating eastern woodland of predominantly hardwood species." The land was apparently clear of trees and used for farming at one point many years ago. The DEC instructed developer to enter a mitigation agreement with the Agency of Agriculture, Food and Markets (Agency) for the loss of these soils. The agreement was incorporated into the permit and

---

[1] The original developers, Village Associates, LLC, have subsequently transferred the project and project property to Housing Vermont, which is not a party to this case.

assessed an off-site mitigation fee pursuant to 10 V.S.A. §§ 6086(a)(9)(B)(iv) and 6093.

¶ 4. Developer appealed only the assessment of the mitigation fee to the Environmental Court. Following a de novo hearing, the Environmental Court held that 10.85 acres of the project site contained primary agricultural soils, thus requiring an off-site mitigation fee. The Environmental Court based its decision on its interpretation of § 6001(15), which, in addition to setting forth a scientific definition of primary agricultural soils, requires soils to have "few limitations for cultivation or limitations which may be easily overcome" to meet the statute's definition. 10 V.S.A. § 6001(15).

¶ 5. The Environmental Court noted that because the Legislature explicitly included forestland in its list of present uses of land that could be considered primary agricultural soils, the presence of trees could not be classified as a limitation to cultivation not easily overcome. The court also rejected developer's argument that the cost of tree removal, a necessary prerequisite to the site's conversion to agricultural use, should be considered. Instead, the court adopted a narrow analysis of whether a limitation can be easily overcome, limiting its inquiry to the "practical or technical difficulty of overcoming the limitation, such as whether water-logged soils may be drained, or whether the existence of a gully prevents logging equipment from reaching the site, rather than the economics of removing [the limitation] for agriculture as compared with removing it for development." Based on this interpretation of § 6001(15), the court concluded that "[t]here is no technical or physical impediment to the removal of trees from the 10.85-acre portion of the project property" and that "the limitation posed by the forest cover for the use of the 10.85-acre portion of the project property for agriculture is a limitation that may be easily overcome." Finally, the court concluded that the parcel was capable of supporting or contributing to an economic or commercial agricultural operation because there were several agricultural operations nearby, and agricultural machinery could enter the property from Malletts Bay Avenue or from West Street.

¶ 6. On appeal, developer makes two arguments: (1) the Environmental Court erred in failing to consider the cost of removing the trees as a limitation to potential cultivation; and (2) the Environmental Court erred in concluding that there was adequate access to the parcel that could support agricultural use. We address each argument in turn.

¶ 7. Under our standard of review, the Environmental Court "determines the credibility of witnesses and weighs the persuasive effect of evidence," and we will not overturn its factual findings "unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." *In re Route 103 Quarry*, 2008 VT 88, ¶ 4, 184 Vt. 283, 958 A.2d 694 (quotation omitted); see also *In re Miller Subdivision Final Plan*, 2008 VT 74, ¶ 13, 184 Vt. 188, 955 A.2d 1200. We review issues of law or statutory interpretation de novo. See *In re Gulli*, 174 Vt. 580, 582, 816 A.2d 485, 488 (2002) (mem.) ("Questions of law are reviewed de novo, allowing us to proceed with a nondeferential, on-the-record review.").[2]

## I.

¶ 8. Developer contends that the cost of tree removal would be so expensive as to preclude conversion of the parcel to any sort of agricultural enterprise, thus amounting to a limitation not easily overcome under the statute. Developer argues that the court erred in refusing to consider cost as a hindrance to overcoming the presence of trees. Further, by failing to consider whether the land could ever actually be converted into a farm, developer contends that the court ignored the purpose of Act 250 — to mitigate the effect of development projects on the agricultural potential of primary agricultural soils. We agree.

¶ 9. The crux of the issue before us lies in the interpretation of the statutory definition of primary agricultural soils. We note that

---

[2] No issue is raised with respect to the deference owed to the Environmental Court in its rulings with regard to Act 250 permit applications. We note, however, that where the outcome of the matter turns not on findings of fact, but on interpretation of a statutory term, and where we are not reviewing a decision by an agency charged with promulgating and interpreting its own rules, we employ the familiar de novo standard of review for matters of law. Thus, we review the Environmental Court's interpretation of the statutory phrase "limitations not easily overcome," not with the deference given to an agency's interpretation of its own rules (a deference we afforded the Environmental Board "[a]bsent compelling indications of error," *In re Nehemiah Assocs.*, 168 Vt. 288, 292, 719 A.2d 34, 36 (1998)), but with our traditional de novo review. See *In re Albert*, 2008 VT 30, ¶ 6, 183 Vt. 637, 954 A.2d 1281 (mem.) ("Because the Environmental Court is a part of the judicial branch, there is no separation-of-powers imperative for deferential review here."); *In re Carroll*, 2007 VT 19, ¶ 9, 181 Vt. 383, 925 A.2d 990 (employing de novo review of statutory interpretation and reversing Environmental Court's dismissal based on its construction of the words "municipal regulatory proceeding").

in interpreting any statute, our primary goal is to give effect to the legislative intent and that we first look to the plain meaning of the statute. See *In re Ambassador Ins. Co.*, 2008 VT 105, ¶ 18, 184 Vt. 408, 965 A.2d 486 ("In construing a statute, we aim to implement the intent of the Legislature and will 'presume the Legislature intended the plain, ordinary meaning of the statute.'" (quoting *Swett v. Haig's, Inc.*, 164 Vt. 1, 5, 663 A.2d 930, 932 (1995))).

■ ■ ¶ 10. Recognizing that Vermont's small farms were in danger of being swallowed by unrestrained commercial development, the Legislature has made it clear that part of the environmental protection and conservation goals of Act 250 is the protection of land that could be put to agricultural use. 1973, No. 85, § 7(a)(2) ("Preservation of the agricultural and forest productivity of the land, and the economic viability of agricultural units . . . are matters of public good. Uses which threaten or significantly inhibit these resources should be permitted only when the public interest is clearly benefited thereby."). Act 250's Criterion 9(B) addresses this goal by imposing an off-site mitigation fee on projects that will threaten the agricultural potential of land identified as primary agricultural soil.[3] Analysis under Criterion 9(B), however, is triggered only upon a threshold determination as to whether the proposed project contains primary agricultural soils. It is this threshold determination that is at the heart of the matter before us.

¶ 11. Thus, we turn to 10 V.S.A. § 6001(15), which defines primary agricultural soils as follows:

---

[3] Review of whether an off-site mitigation fee should be imposed essentially involves three steps: first, the court must determine whether the proposed development site contains primary agricultural soil as defined under 10 V.S.A. § 6001(15); second, the court determines whether the proposed project will significantly reduce the agricultural potential of these soils; and third, if the court determines that a significant reduction in the agricultural potential of the primary agricultural soils will occur, the court moves onto analysis of whether the permit can be granted notwithstanding the reduction of agricultural potential under four subcriteria set forth in 10 V.S.A. § 6086(a)(9)(B). See *In re Spear Street Assocs.*, 145 Vt. 496, 500-01, 494 A.2d 138, 140-41 (1985) (setting forth sequential analysis). The parties here contest only the analysis done under the threshold inquiry — a determination of the existence of primary agricultural soils on the proposed site — and stipulate that if primary agricultural soils exist, developers have satisfied the four criteria set forth in § 6086(9)(B) and will pay an offsite mitigation fee in accordance with 10 V.S.A. § 6093.

"Primary agricultural soils" means soil map units with the best combination of physical and chemical characteristics that have a potential for growing food, feed, and forage crops, have sufficient moisture and drainage, plant nutrients or responsiveness to fertilizers, few limitations for cultivation or limitations which may be easily overcome, and an average slope that does not exceed 15 percent. Present uses may be cropland, pasture, regenerating forests, forestland, or other agricultural or silvicultural uses. However, the soils must be of a size and location, relative to adjoining land uses, so that those soils will be capable, following removal of any identified limitations, of supporting or contributing to an economic or commercial agricultural operation.

10 V.S.A. § 6001(15).

¶ 12. The definition essentially has three separate parts: (1) a requirement of a scientific determination as to the soil composition and a determination that "soil map units . . . have . . . few limitations for cultivation or limitations which may be easily overcome"; (2) a list of acceptable present uses of the land that do not preclude a determination that primary agricultural soils exist, including regenerating forests and forestland; and (3) a requirement that the soils be of a size and location such that they would be capable of supporting or contributing to an agricultural enterprise following removal of any limitations. *Id.* The present controversy concerns the first part of the definition, specifically the meaning of the words "few limitations for cultivation or limitations which may be easily overcome."

■ ¶ 13. Though the statute does not define the word "limitations," the Environmental Court and its predecessor, the Environmental Board, have found limitations that preclude a finding of primary agricultural soils to exist when the soil is excessively steep, treed, rocky, or wet.[4] See *In re Sw. Vt. Health Care Corp. Land Use Permit*, No. 8B0537-EB, 2001 WL 190438, at *6 (Vt. Envtl. Bd. Feb. 22, 2001) (concluding that fact that soil was "too steep, stony, treed or dominated by ledge" were limitations that could not be easily overcome); *In re John A. Russell Corp. Land*

---

[4] Prior to the 2006 amendment to 10 V.S.A. § 6001(15), the Environmental Board routinely concluded that the presence of trees amounted to a limitation not easily overcome. See 2005, No, 183 (Adj. Sess.), § 6 (amending § 6001(15)).

*Use Permit*, No. 1R0849-EB, 2001 WL 789637, at *20 (Vt. Envtl. Bd. July 10, 2001) (concluding that soil's "wetness limitations" could not be easily overcome); *Raymond Duff Land Use Permit*, No. 5W0921-2R-EB, 1991 WL 177073, at *10 (Vt. Envtl. Bd. June 14, 1991) (concluding that fact that soils were not well drained and had significant wet areas were limitations that could not be easily overcome); *In re Landmark Dev. Corp.*, No. 4C667 — EB, 1988 WL 220541, at *9 (Vt. Envtl. Bd. Jan. 22, 1988) (finding extreme stoniness and wetness were limitations not easily overcome).

■ ■ ¶ 14. Though the Environmental Board decisions often conflate analysis of whether a limitation exists with analysis of whether that limitation can be easily overcome, the plain language of the statute indicates there are two steps. Under the first step, a determination as to the existence of a limitation must be made — e.g., a determination as to whether the land is excessively wet, excessively treed, covered with rocks, or located on a steep incline or ledge. Once a limitation is found to exist, the next step is to determine whether the limitation can be easily overcome. Determination of the practical and technical difficulties of converting land to agricultural use is the touchstone of the analysis under this second step; however, the cost of overcoming a limitation and whether the cost demands can be easily overcome is a relevant factor, and nothing in the statute precludes the Environmental Court from considering it.[5] The Agency itself testified that though the cost of remediating a limitation is not addressed in every permit application, it is something that "would tie into the feasibility of, for example, removing the trees" and that there may be times when the cost of removing a limitation is so extreme that it amounts to a limitation not easily overcome. Indeed, though the cost of overcoming a limitation, such as the presence of trees, will rarely be a trump card that precludes a finding of primary agricultural soils, cost is still one of many factors to be considered, along with physical and practical difficulties of overcoming a

---

[5] The dissent argues for a different interpretation of § 6001(15), which replaces this two-step process with a puzzling "either/or" analysis. The dissent contends that an agency or court applying § 6001(15) has a choice of looking to whether there are "few limitations" to cultivation or whether there are "limitations which may be easily overcome." *Post*, ¶ 34. Such a reading, however, essentially writes the words "easily overcome" out of the statute and grants the agency or court applying the statute the unfettered discretion to choose how stringently the statute will be applied.

limitation, such as tiling land to overcome wetness, removing stones, or eliminating inclines.

¶ 15. Here, the presence of a "healthy eastern woodland" on the 10.85 acres that would otherwise contain primary agricultural soil presents a definite limitation for cultivation, as this forest cover would have to be removed before any farming could begin. Although the trial court made findings of fact with regard to the existence of practical and technical difficulties of overcoming tree removal (for instance, in considering whether waterlogged soils may be drained, or whether the existence of a gully prevents logging equipment from reaching the site), it erred in refusing to consider the cost of removing the trees and concluding that cost of removal of a limitation is not a relevant consideration.

¶ 16. Our interpretation is consistent with the legislative purpose of Act 250, which seeks to protect primary agricultural soils and Vermont small farms while encouraging responsible development. This goal is not forwarded by protecting land that, even without development, would not be capable of sustaining any sort of agricultural venture. The Legislature recognized this reality when it chose to narrow the definition of primary agricultural soils with the qualifier that there be "few limitations for cultivation or limitations which may be easily overcome." 10 V.S.A. § 6001(15). The Legislature did not intend to protect every parcel of land that contained the physical and chemical characteristics of primary agricultural soil regardless of any logistical challenges to its agricultural use. An interpretation of § 6001(15) that includes analysis of whether or not removing a limitation for cultivation would be prohibitively expensive is consistent with both the plain language of the statute and the broader Act 250 statutory scheme and purpose. See In re Ambassador Ins. Co., 2008 VT 105, ¶ 18; In re Spring Brook Farm Found., Inc., 164 Vt. 282, 287, 671 A.2d 315, 318-19 (1995) (interpreting "commercial dwelling" to reflect plain meaning as well as "the reason and spirit of the law").

¶ 17. Indeed, the conservation goals of Act 250 have always been balanced against the economic necessity of development, and the result has been collaboration between environmental and business interests as well as a practical approach to regulation. See J. Safran, Zero Sum Game: The Debate Over Off-Site Agricultural Mitigation Measures, 6 Vt. J. Envtl. L. 15 (2005). For instance,

the very imposition of an off-site mitigation fee, which allows developers to undertake a project in spite of the project's adverse impact on primary agricultural soils if the developers pay a fee into a housing and conservation trust, is an example of the sort of compromise between conservation and development that Act 250 fosters. 10 V.S.A. § 6093(a)(1) (providing that offsite mitigation fee be paid into Vermont housing and conservation trust fund "for the purpose of preserving primary agricultural soils of equal or greater value with the highest priority given to preserving prime agricultural soils"); *id.* § 302(a) (providing that funds in Vermont housing and conservation trust be used to further the goal of "conserving and protecting Vermont's agricultural land").

¶ 18. Allowing development to proceed if an off-site mitigation fee is paid is consistent with the practical goal of protecting land that has the actual potential of being used for farming. Indeed, instead of requiring developers to engage in on-site mitigation measures, which might result in fragmented and ineffective preservation, allowing off-site mitigation measures allows for preservation of larger tracts of land that may more easily be preserved for agricultural use. This reasoning has been employed by the Environmental Board in its analysis under Act 250's Criterion 9(B). See *Sw. Vt. Health Care Corp.*, 2001 WL 190438, at *30 ("[A]llowing only on-site mitigation for a project, may, in the long run, fail to carry out Act 200's and Act 250's goals by attempting to preserve farmland which will ultimately be overwhelmed and fragmented by development at the expense of protecting large parcels of land which are more amenable to preservation.").

■ ¶ 19. Similarly, the Legislature's intent to protect Vermont's farmland from disappearance at the hands of more profitable development cannot be used to justify imposition of protection measures for fictitious farms — i.e., land that will not be used for farming regardless of the proposed development because it is logistically difficult or too costly to overcome existing limitations. See *In re Vermont RSA Ltd. P'ship*, 2007 VT 23, ¶ 9, 181 Vt. 589, 925 A.2d 1006 (mem.) (noting underlying purpose of Act 250 is "to regulate the *impacts* of development, not the p urpose served, nor the parties benefited by the construction"); *Braun v. Bd. of Dental Exam'rs*, 167 Vt. 110, 117, 702 A.2d 124, 128 (1997) ("We presume that the Legislature does not intend an interpretation that would lead to absurd or irrational consequences."); *In re Southview Assocs.*, 153 Vt. 171, 175, 569 A.2d 501, 503 (1989)

(avoiding statutory construction "that would render the legislation ineffective or irrational"). Provisions of Act 250, like the off-site mitigation provision, support a practical approach to conservation efforts, an approach that is at odds with a statutory interpretation that essentially requires the decisionmaker to ignore the realities of potential land use. See *In re Eustance Act 250 Jurisdictional Opinion*, 2009 VT 16, ¶ 17 n.11, 185 Vt. 447, 970 A.2d 1285 (refusing to impose blanket farming exemption from Act 250 review where Act 250 jurisdiction was based on commencement of construction of subdivision and where agricultural activities at issue were commenced within a preexisting nonagricultural subdivision).

■ ¶ 20. The State makes much of the 2006 amendment to § 6001(15). That amendment added reference to forests and forestland to the second sentence of the definition, thus including these types of land in the list of permissible current uses. The State's arguments notwithstanding, the amendment does not preclude consideration of the cost of removing trees found in forests or forestlands in determining whether limitations on conversion to agricultural use presented by the presence of trees can be easily overcome. The amendment merely clarifies that forested land is not *automatically* eliminated from the analysis of whether primary agricultural soils exist, a practice that was apparently commonplace. See, e.g., *In re Sw. Vt. Health Care Corp.*, 2001 WL 190438, at *6 (precluding finding that portion of land primary agricultural soil because soil "too steep, stony, treed or dominated by ledge"); *John A. Russell Corp*, 2001 WL 789637, at *20 (finding 2.5 acres of project tract did not qualify as primary agricultural soils because soil was "excessively wooded or [has] wetness limitations that are not easily overcome").

■ ¶ 21. The amendment did not herald a major change in the law, automatically precluding the presence of trees and the ease of their removal from consideration as a limitation. Rather, the 2006 amendment appears to be a reaction to the practice discussed above, in which the reviewing body gave undue weight to the presence of trees in its analysis of whether primary agricultural soils existed. The amendment merely serves as a clarification that the presence of trees is not a per se "limitation not easily overcome" under the statute. See *Albert*, 2008 VT 30, ¶ 13 ("[W]e generally presume that an amendment to a statute was meant to

change the law unless circumstances clearly show that only a clarification was intended."); see also *Eustance*, 2009 VT 16, ¶ 17 (examining farming exemption contained in Act 250's definition of "development" and noting that "if the Legislature intended a total exemption for farming from all Act 250 jurisdiction, it needed to say so").

¶ 22. The amended statute contemplates instances where the presence of trees and the cost of removing them will create a limitation for cultivation that is simply impossible to overcome; however, there is nothing in the statute mandating this outcome whenever forested land is involved. Indeed, there may also be instances where it is entirely feasible and economically practicable to remove trees to ready land for agricultural use — the fact that trees themselves have economic value suggests that this may often be the case. For instance, testimony from Agency officials indicated that there may be ways to overcome the cost of tree removal, including removing the trees over an extended period of time or allowing the farmer to remove the trees himself. These questions will be for the Environmental Court to consider on remand.

¶ 23. Finally, we note that contrary to the Environmental Court's conclusion, consideration of the economic feasibility of tree removal to ready the land for an agricultural enterprise does not involve a comparison to the economic feasibility of tree removal to ready the land for development — the Environmental Court is correct in that such a comparison will almost always favor development. Instead, consideration of the cost of removing a limitation will involve only a consideration of whether the cost of removal is so high that conversion of the land into agricultural use is not economically feasible.[6] This analysis may involve inquiry

---

[6] The dissent repeats the Environmental Court's mischaracterization of the inquiry involved in identifying whether the limitation of trees may be easily overcome. *Post*, ¶ 47. Notwithstanding the dissent's contention, inquiry into the cost of tree removal will not involve inquiry into whether the land may be used as farmland by future generations. Nor will it involve complicated projections and analysis of the value of future crops. Instead, these types of economic comparisons and projections are appropriate only at the third step of identification of primary agricultural soils, which requires that soils "be of a size and location, relative to adjoining land uses, so that those soils will be capable, following removal of any identified limitations, of supporting or contributing to an economic or commercial agricultural operation." 10 V.S.A. § 6001(15).

into the standard range of profit margins for the contemplated agricultural enterprise and whether those margins support the cost of first removing the limitation — here, trees.[7] Cost of removing the trees, thus, is neither the starting point nor ending point of the inquiry and, instead, becomes another factor to consider, along with practical and technical considerations that the court considered here.

¶ 24. The trial court has a "fundamental duty to make all findings necessary to support its conclusions, resolve issues before it, and provide [an] adequate basis for appellate review." *In re Hignite*, 2003 VT 111, ¶ 10, 176 Vt. 562, 844 A.2d 735 (mem.). Because the Environmental Court made no findings regarding the limitations on agricultural use imposed by the cost of removing the trees currently on the 10.85 acres in question, we remand for resolution of this issue in accordance with the standard set forth above.

## II.

¶ 25. Next, developer contends that the Environmental Court erred in finding that there was adequate access to the 10.85 acres at issue for commercial agricultural use. Developer argues that the court based its conclusion that adequate access existed on the construction plans for an access road contemplated by the development project and not on the access presently in existence. We disagree.

¶ 26. Under the second part of the definition of primary agricultural soils found in 10 V.S.A. § 6001(15), the court must examine the location of agricultural soils "relative to adjoining land uses, so that those soils will be capable, following removal of any identified limitations, of supporting or contributing to an

---

[7] During the hearing below, developers employed the services of a contractor to estimate the cost of doing site work for the project, including the cost of clearing the trees presently on the site. The contractor testified that the cost for the clearing, stumping, and grubbing of the site would be $150,000, an amount that included the cost of actual tree removal, erosion control measures, dumping fees, and costs of machinery and diesel, offset by the sale value of usable logs. We note that the Environmental Court did not make a finding regarding what the cost of removing the trees would be and that evidence was presented below (and will presumably be presented on remand) challenging the $150,000 as not reflecting measures that might lower the cost for conversion to agricultural use, such as equipment sharing by small farmers, sweat equity, or staggered removal.

economic or commercial agricultural operation." Thus, the court must look to the land's proximity to other agricultural operations such that it could contribute to the agricultural market. This sort of inquiry is commonly undertaken by the Environmental Board (now the Environmental Court). See, e.g., *John A. Russell Corp.*, 2001 WL 789637, at *37 (concluding that because there was another farm immediately adjacent to project tract and several active farms nearby, project tract was capable of contributing to an economic agricultural operation).

¶ 27. Here, the court sifted through evidence regarding present and proposed access points to the parcel and made numerous findings in support of its conclusion that adequate access to the parcel would exist if the land were used for farming. The court evaluated expert testimony, detailed maps and aerial photographs, and evidence gleaned from the judge's site visit. This evidence was the basis for the court's conclusion that there are currently two access points to the parcel from residential streets located on the eastern side of the land (West Street and Hickok Street). In addition, the court found that the property has a total of 300 feet of frontage onto Malletts Bay Avenue, including frontage from two existing residential lots in the northeast corner of the property, which had been purchased by developer.

¶ 28. The court found that "[t]he 10.85-acres of the project property could be used to grow hay, or to grow vegetables and fruits, all of which require far less frequent access to the site for large machinery." Based on this finding, the court concluded that "[a]gricultural machinery could enter the property via either the Malletts Bay Avenue entrance or the West Street entrance to the property." Thus, even if we were to agree with developer that the court considered the development project's contemplated construction of a new road to Malletts Bay Avenue through two existing residential lots (a tenuous assertion), it would not change the fact that the court found that the parcel is still accessible from West Street, a finding that is enough, by itself, to support the court's conclusion regarding access. Moreover, we will not overturn these findings as they are adequately supported by the record and were not clearly erroneous. See *Route 103 Quarry*, 2008 VT 88, ¶ 4; *Spear Street Assocs.*, 145 Vt. at 499, 494 A.2d at 140.

*Reversed and remanded.*

¶ 29. **Reiber, C.J.,** dissenting in part and concurring in part. The plain language of Act 250 allows only a few carefully circum-

scribed situations in which primary agricultural soils will not be protected. This is not one of those circumstances. Further, when interpreting statutes, "our primary objective is to effectuate the intent of the Legislature." *Swett v. Haig's, Inc.*, 164 Vt. 1, 5, 663 A.2d 930, 932 (1995). Through Act 250 and its various amendments, the Legislature has expressed an unequivocal intent to protect Vermont's primary agricultural soils. Because the majority misinterprets the plain meaning and legislative intent of Act 250 by allowing cost to determine whether soils may be classified as primary agricultural soils, I dissent from that part of the majority's opinion.[8]

¶ 30. Developer does not wish to pay a mitigation fee for the roughly ten acres of land that are at issue here. Under 10 V.S.A. § 6086(a)(9)(B) (commonly referred to as Criterion 9B), mitigation is required "for any reduction in the agricultural potential of the primary agricultural soils caused by the development or subdivision." A developer of a project in a designated growth center complies with § 6086(a)(9)(B) by paying an offsite mitigation fee for "the purpose of preserving primary agricultural soils of equal or greater value with the highest priority given to preserving prime agricultural soils as defined by the U.S. Department of Agriculture." 10 V.S.A. § 6093(a)(1). Developer alleges that it should not have to pay a mitigation fee because, according to developer, there are no primary agricultural soils on its construction site. I disagree.

¶ 31. Act 250 defines primary agricultural soils as follows:

> "Primary agricultural soils" means soil map units with the best combination of physical and chemical characteristics that have a potential for growing food, feed, and forage crops, have sufficient moisture and drainage, plant nutrients or responsiveness to fertilizers, few limitations for cultivation or limitations which may be easily overcome, and an average slope that does not exceed 15 percent. Present uses may be cropland, pasture, regenerating forests, forestland, or other agricultural or silvicultural uses. However, the soils must be of a size and location, relative to adjoining land uses, so that those soils will be capable, following removal of any identified

---

[8] I concur in Part II of the majority opinion on developer having adequate access to the parcel.

limitations, of supporting or contributing to an economic or commercial agricultural operation. Unless contradicted by the qualifications stated in this subdivision, primary agricultural soils shall include important farmland soils map units with a rating of prime, statewide, or local importance as defined by the Natural Resources Conservation Service (N.R.C.S.) of the United States Department of Agriculture (U.S.D.A.).

10 V.S.A. § 6001(15).

¶ 32. This case is about whether developer's ten-acre parcel of land constitutes "soil map units with the best combination of physical and chemical characteristics that have . . . few limitations for cultivation or limitations which may be easily overcome." *Id.* Developer does not dispute the quality or physical and chemical characteristics of the soils on the property, nor the classification of those soils as "soils of statewide importance." Developer suggests, however, that both the existence of trees on the parcel and the cost of removing them are not only limitations to cultivation, but limitations that are not easily overcome. I disagree. In my view, the Environmental Court was correct in holding that the statutory definition of primary agricultural soils does not allow cost to be considered during classification.[9]

¶ 33. When interpreting a statute, we aim to implement legislative intent, and we " 'presume the Legislature intended the plain, ordinary meaning of the statute.' " *In re Ambassador Ins. Co.*, 2008 VT 105, ¶ 18, 184 Vt. 408, 965 A.2d 486 (quoting *Swett,*

---

[9] I agree with the majority that the standard of review of this purely legal question of statutory interpretation is de novo. See *ante,* ¶ 7 & n.2. That said, nothing in the majority's decision today disturbs our precedents stating that we afford deference to the Environmental Court in the interpretation of municipal zoning ordinances, e.g., *In re Jenness,* 2008 VT 117, ¶ 22, 185 Vt. 16, 968 A.2d 316 ("Our review is deferential, and we will reverse the court's construction of the ordinance only if it is clearly erroneous."); *In re Weeks,* 167 Vt. 551, 554, 712 A.2d 907, 909 (1998) ("Our standard for reviewing the Environmental Court's interpretation of a zoning ordinance is whether the construction is clearly erroneous, arbitrary or capricious."), and that we also defer in the interpretation of permit conditions, e.g., *In re Hamm Mine Act 250 Jurisdiction,* 2009 VT 88, ¶ 9, 186 Vt. 590, 980 A.2d 286 (mem.) ("We defer to the Environmental Court's construction of land-use permit conditions."); *Agency of Natural Resources v. Weston,* 2003 VT 58, ¶ 16, 175 Vt. 573, 830 A.2d 92 (mem.) ("[W]e must accord deference to the environmental court's construction of a permit condition, particularly when the court's expertise will assure consistent interpretations of the law.").

164 Vt. at 5, 663 A.2d at 932). Both the plain meaning of the statutory definition of primary agricultural soils and legislative intent support the conclusion that this Court's determination of the access issue precludes any need for discussing the one other limitation alleged — the cost of removing the trees. Further, contrary to the majority's conclusion, plain meaning and legislative intent make it clear that financial costs are not among those factors that may be considered in determining whether a parcel meets the definition of primary agricultural soils.

¶ 34. Primary agricultural soils are defined in part as having "few limitations for cultivation or limitations which may be easily overcome." 10 V.S.A. § 6001(15). The majority promotes the view that the plain language of the statute therefore requires a two-step inquiry: "a determination as to the existence of a limitation," and then, if a limitation exists, "the next step is to determine whether the limitation can be easily overcome." *Ante*, ¶ 14. The majority's interpretation, however, runs directly counter to the plain language of the statute, which states that the soils at issue here are primary agricultural soils so long as they have "few limitations for cultivation *or* limitations which may be easily overcome." 10 V.S.A. § 6001(15) (emphasis added). Here, it is undisputed that these soils have "few limitations," and we therefore need not even reach whether those limitations are easily overcome. Developer alleges that there are only two limitations on these ten acres: (1) access; and (2) the presence of trees. The majority upholds the Environmental Court's conclusion that access to the parcel in question is not a limitation. *Ante*, ¶¶ 25-28. Thus, the presence of trees is the *only* remaining alleged limitation to cultivation. One limitation necessarily meets the statutory definition of "few limitations." These soils are therefore primary agricultural soils.

¶ 35. Our review of the issue should end here. The majority, however, ignores the fact that one limitation to cultivation is not enough to declassify primary agricultural soils and goes on to address how easily that one limitation may be overcome. As I also disagree with the majority's view of that issue, I address it as well.

¶ 36. The majority holds that, despite the plain language of the statute and legislative intent to the contrary, cost may be taken into account when determining whether soils meet the physical and chemical requirements of the statute. The plain language of

the statute and legislative intent, however, indicate that chemical and physical limitations to cultivation are the *only* limitations that may be considered. Thus, the economic feasibility and financial costs of preparing land for cultivation are not limitations that may be considered when determining whether soils of statewide importance are primary agricultural soils.

¶ 37. The majority concludes that the plain language of the statute, because it does not explicitly exclude consideration of cost, allows cost to be a factor in classifying primary agricultural soils. *Ante,* ¶ 14. However, the plain language does, in fact, indicate that cost is not one of the factors that should be considered. In the first sentence of § 6001(15), the Legislature lists those characteristics which offer "the best combination" for growing crops. This sentence is composed of a list of characteristics that modify "physical and chemical characteristics." Under the canon of construction noscitur a sociis, we must "seek the meaning from the context and by the light of what precedes or follows." *Parks' Adm'r v. Am. Home Missionary Soc'y,* 62 Vt. 19, 25, 20 A. 107, 108 (1890); accord, e.g., *MacDonough-Webster Lodge No. 26 v. Wells,* 2003 VT 70, ¶ 11 n.2, 175 Vt. 382, 834 A.2d 25 (stating that "noscitur a sociis" means roughly "it is known by its associates"). In context, the word "limitations" modifies "physical and chemical characteristics" and therefore cannot be meant to encompass economic considerations. In fact, the other attributes included in the list are all physical and chemical characteristics of soil. These include having nutrients or the ability to receive nutrients, enough moisture and drainage, and a gentle enough slope.[10] Therefore, the Legislature intended that any limitations to cultivation should,

---

[10] According to testimony and evidence provided by the Agency of Agriculture, these characteristics must be assessed separately from the N.R.C.S. determination of importance because the soil map units are general and may not take into consideration ridges, rivers, or other physical and chemical characteristics specific to the parcel in question. For example, one of the Agency of Agriculture's exhibits, *Farmland Classifications Systems for Vermont Soil,* showed that "[d]elineations of some soil map units that are Prime, Statewide, or Local have limitations, such as excessive wetness, limited depth to bedrock, or slope . . . . It is assumed that delineations of these map units are Prime, Statewide, or Local, unless an on-site determination finds that the delineation should not be Important Farmland." Similarly, the Agency of Agriculture can take into account other physical impediments such as the difficulty or impossibility of tree removal due to poor access. For example, during testimony in front of the Environmental Court, an expert for the Vermont Agency of Agriculture stated that "if there is a million dollar price tag to take trees out because you have to lift them out with a helicopter, then that

like the other attributes included in the list, pertain to the physical or chemical characteristics of the land.

¶ 38. As cost is not a limitation the statute allows us to consider, the expense of overcoming a limitation is not open to consideration either. The majority concludes that cost affects the "ease" of overcoming chemical and physical limitations to cultivation and should therefore not be excluded from consideration. *Ante,* ¶¶ 14-24. In general, the majority is correct that cost always affects how easily a limitation may be overcome. Nevertheless, under the statute at issue here, the Legislature could not possibly have intended that cost be a factor in the classification of primary agricultural soils. Instead, the Legislature intended that the determination of whether a limitation is easily overcome be based on the extent of any physical impediments to implementing whatever chemical and physical remedies are required in order to overcome existing limitations. Even in its original form, the definition of primary agricultural soils was interpreted as being "based solely on the physical capability and chemical properties of soils," as opposed to being "defined according to economic as well as physical criteria." Note, *The Effect of Act 250 on Prime Farmland in Vermont,* 6 Vt. L. Rev. 467, 475 n.53 (1981). Consideration of cost improperly shifts the focus of the statute from the physical possibility of cultivation to the financial cost-effectiveness of cultivation.

¶ 39. That cost is not a factor to be considered in the classification of primary agricultural soils is not only dictated by the plain meaning of the statute, but it is also supported by the intent of the Legislature in enacting the statutory provision in question here. We have previously held that Criterion 9(B) of Act 250 expresses a clear legislative intent "to preserve the agricultural potential of prime agricultural soils." *In re Nehemiah Assocs.,* 168 Vt. 288, 290, 719 A.2d 34, 35 (1998). In interpreting Act 250, our "primary objective" must be to give effect to this clearly expressed legislative intent. *Swett,* 164 Vt. at 5, 663 A.2d at 932.

---

would be taken into consideration . . . *because there was no access.*" (Emphasis added.) Here, however, that is not the case. The Agency of Agriculture presented evidence and the Environmental Court made a factual finding that there were no physical impediments that would act as a limitation to the cultivation of the ten acres at issue.

¶ 40. According to the majority, legislative intent to protect Vermont's farmland "cannot be used to justify imposition of protection measures for fictitious farms — i.e., land that will not be used for farming . . . because it is logistically difficult or too costly to overcome existing limitations." *Ante,* ¶ 19. While I agree with the majority that the Legislature intended that "logistical difficulties" such as slope and wetness would in some instances disqualify land from classification as primary agricultural soils, I cannot agree that the Legislature intended to disqualify soils of statewide importance based on cost — a characteristic that has no bearing upon soil quality.

¶ 41. The majority concludes that the mitigation provisions of Act 250 allow the cost of overcoming limitations to be considered when classifying primary agricultural soils because the compromise between "economic necessity of development" and conservation is inherent in mitigation. *Ante,* ¶ 17. The majority is mistaken in its understanding of the Legislature's intent in enacting the mitigation provisions as a whole and mitigation's bearing on the specific definition of primary agricultural soils. Contrary to the majority's interpretation, the process of classifying primary agricultural soils is not supposed to be a compromise. While the mitigation provision itself does allow primary agricultural soils to be destroyed in certain areas to permit smart, concentrated development, the majority overlooks the fact that, in enacting the mitigation provision, the Legislature was in no way lessening or weakening protections of primary agricultural soils. Not only does the Legislature require through mitigation that the developer pay to protect the same amount of high-quality soil somewhere else, but the Legislature has, throughout the history of Act 250, worked to strengthen protections of primary agricultural soils.

¶ 42. The Vermont Legislature enacted Act 250 to protect agricultural and forested lands from development. See 1969, No. 250 (Adj. Sess.), §§ 1, 19 (finding that "the unplanned, uncoordinated and uncontrolled use of the lands and the environment of the state of Vermont has resulted in usages of the lands and the environment which may be destructive to the environment and which are not suitable to the demands and needs of the people of the state of Vermont" and requiring the adoption of "a capability and development plan . . . which will . . . tend toward . . . the conservation and production of the supply of food"). Throughout the years since Act 250 was enacted, the Legislature has passed

numerous amendments to Act 250 that reiterate its intent to protect agriculturally productive soils. In 1973, the Legislature enacted Act 85, finding that the "[p]reservation of the agricultural and forest productivity of the land . . . [is a] matter[] of public good" and that "[u]ses which threaten or significantly inhibit these resources should be permitted only when the public interest is clearly benefited thereby." 1973, No. 85, § 7(a)(2). In the same act, the Legislature added Criterion 9(B) to Act 250 (codified at 10 V.S.A. § 6086(a)(9)(B)), which outlines when permits for development of primary agricultural soils may be granted. 1973, No. 85, § 10. The Legislature also added a definition of primary agricultural soils (codified at 10 V.S.A. § 6001(15)). 1973, No. 85, § 8. In 2006, the Legislature took additional steps to protect primary agricultural soils when it amended § 6001(15) by adding language that explicitly expanded the types of present land uses that may be considered as occurring on primary agricultural soils. 2005, No. 183 (Adj. Sess.), § 6.

¶ 43. In 2006, the Legislature also amended 10 V.S.A. § 6086 to allow development when it "will not result in *any reduction* in the agricultural potential of the primary agricultural soils," compared to the previous wording of § 6086 which disallowed development if the agricultural potential of primary agricultural soils was "significantly" reduced. *Id.* § 7 (emphasis added). Where development is allowed, the Legislature now requires mitigation "for *any* reduction in the agricultural potential of the primary agricultural soils caused by the development or subdivision." *Id.* (emphasis added). While mitigation is a compromise that recognizes that development sometimes necessitates the destruction of primary agricultural soils, the mitigation provision highlights a clear legislative intent to require developers to pay for soil preservation when they destroy any primary agricultural soils.

¶ 44. One final problem with the majority's interpretation is that it forces parties to present testimony on cost when, as a practical matter, cost cannot possibly lead to the declassification of primary agricultural soils. "[C]onsideration of the cost of removing a limitation," the majority states, "will involve only a consideration of whether the cost of removal is so high that conversion of the land into agricultural use is not economically feasible." *Ante,* ¶ 23. In making this determination, a court must also take into consideration that Act 250 is designed to preserve the *future* value of soils to farmers if the land were to be left alone. See, e.g.,

136

*Nehemiah Assocs.*, 168 Vt. at 290, 719 A.2d at 35 (noting that Act 250 aims to protect "agricultural *potential*" (emphasis added)). Thus, the question is not whether someone wants to farm the land at issue now, but whether it might ever be profitable to farm this land in the future. The intent of the Legislature in protecting primary agricultural soils was to presume that such soils could have a high future value. It is well known that crop prices are susceptible to large upswings based on any number of factors, including natural and manmade disasters that can greatly limit the amount of farmable land available to future generations: in the future, crops could be much more valuable than they are today. Thus, farming that is unprofitable today could be profitable tomorrow, reinforcing the fact that Vermont's primary agricultural soils have chemical and physical properties that make them *invaluable*.

¶ 45. Nothing in the majority's decision today alters the fact that, if some type of economic analysis is made, it must take into account the possibility that farming could be much more profitable in the future than it is today. Therefore, the burden on the developer is impossible to overcome because the developer would be required to show that it could *never* be economically feasible to farm the area, when, in fact, the future economic value of Vermont's primary agricultural soils is virtually limitless. As a result, the majority's decision today requires agencies and courts to engage in a pointless exercise that will always result in a finding that cost is not a basis for declassifying parcels that have been found to be primary agricultural soils based on their chemical and physical characteristics.

¶ 46. Although the majority opinion notes that the intent of Act 250 is to protect agricultural resources, their words ring hollow. That the land is "capable of sustaining any sort of agricultural venture," *ante*, ¶ 16, is a chemical and physical determination — not an economic one. Not only is the language of the subsection defining primary agricultural soils unambiguous about cost not being a subject for consideration, but an interpretation that does consider cost runs contrary to the Legislature's intent in enacting the primary agricultural soils provisions of Act 250.

¶ 47. Here, the N.R.C.S. designated the parcel in question as being of statewide importance. Under the statute, this explicitly qualified the parcel as primary agricultural soils. From that starting point, the statute requires a review of the chemical and

physical characteristics of the soil map unit to ensure that primary agricultural soils do in fact exist on that parcel. In this case, the initial presumption that these are, in fact, primary agricultural soils, is not contradicted. The review of chemical and physical characteristics of the soil map unit showed that this parcel met the criteria outlined by the statute. The land at issue here is capable, both chemically and physically, of sustaining an agricultural venture. Act 250 demands that this land be protected or that, if it is to be destroyed, primary agricultural soils elsewhere in the state must be protected in its stead. I would therefore hold that a remand is not necessary here because, as a matter of law, developer has presented no legitimate basis for avoiding the mitigation fee that the Environmental Court properly held to be required here. For these reasons, I respectfully dissent.