NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 46

No. 2017-433

| | |
|---|---|
| Parker's Classic Auto Works, Ltd. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Civil Division |
| | |
| Nationwide Mutual Insurance Company | October Term, 2018 |

Helen M. Toor, J. (amended entry regarding motion); Samuel Hoar, Jr., J. (final judgment)

Robert P. McClallen, Rutland, for Plaintiff-Appellant.

Eric T. Boron and Roy A. Mura of Mura & Storm, PLLC, Buffalo, New York, for
  Defendant-Appellee.


PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.


¶ 1.    **CARROLL, J.**    Plaintiff appeals a judgment entered in favor of defendant following a trial in which a jury determined that defendant breached an insurance contract with plaintiff's assignors. The jury awarded plaintiff $41,737.89 in damages. After the trial the superior court concluded that, as a matter of law, plaintiff could not show that his assignors were damaged by a breach of contract by defendant. We reverse this determination, vacate the judgment that was entered in favor of defendant, and remand with direction to the superior court to reinstate the jury's verdict and its award of damages.

## I.  Factual and Procedural History

¶ 2.     The following are the facts from the trial record taken in the light most favorable to plaintiff.  Brueckner v. Norwich Univ., 169 Vt. 118, 122, 730 A.2d 1086, 1090 (1999) (explaining that we must view evidence in the "light most favorable to the non-moving party" on appeal of a motion for judgment as a matter of law) (quotation omitted).  Plaintiff is a car repair business in Rutland.  Defendant insures the vehicles of dozens of plaintiff's customers ("the insureds") who hired plaintiff to repair damage to their vehicles between 2009 and 2014.  Over seventy insurance claims, which all arise under identical insurance policies, have been combined in this breach-of-contract case.  For each insurance claim plaintiff repaired a car belonging to an insured, restoring it to preaccident condition, and, after receiving a post-loss assignment from an insured,[1] submitted itemized bills to defendant to recover for its services.  Plaintiff then released each vehicle to its owner.  In each instance, defendant paid less than what plaintiff had billed to complete the repair.  The difference between the cost of repair billed by the repair shop and the amount paid by the insurance company—to whatever extent it is covered by the insurance policy—is called a short pay in the collision-repair industry.  Plaintiff submitted to defendant a final invoice and a "supplemental report" itemizing each of the repairs performed.

¶ 3.     For each claim involved in this case, although defendant did not pay a portion of what the repair shop believed was owed under the policy, defendant did pay significant sums.  Defendant initially paid what its claims adjuster believed to be covered by the insurance policy

---

[1]  The insurance policy prohibits assignment of "any interest" in the policy without insurer's consent.  Defendant has not invoked this clause, so we do not address it.  But we note that a clause prohibiting the assignment of "interests" in an insurance policy is generally interpreted to prohibit the pre-loss assignment of coverage under the policy, not the post-loss assignment of a claim.  In re Ambassador Ins., 2008 VT 105, ¶¶ 12-13, 184 Vt. 408, 965 A.2d 486.  An anti-assignment clause is meant to protect the insurer from unaccounted risk posed by an assignee, designated unbeknownst to the insurer, before a covered loss occurs.  3 S. Plitt et al., Couch on Insurance § 35:8 (3d ed. 2019).  This purpose is not served by prohibiting post-loss assignment of claims.

after having conducted a visual inspection of the damage. Defendant generally would make at least one additional payment based on information provided by plaintiff after plaintiff disassembled the damaged vehicle in preparation to repair it. Payment to repair additional damage that is not apparent from a visual inspection of the vehicle is called a supplemental payment. After the adjuster's initial estimate was paid to plaintiff and any supplemental payments were made, there was still an outstanding balance for the repair bill on each claim involved in this case. Plaintiff believed these were covered by the insurance policy yet had been unpaid by the insurer. However, defendant maintained that these unpaid portions of the repair bill between plaintiff and each insured were not covered under the policy.

¶ 4. Plaintiff filed suit as the insureds' assignee to recover these purported short pays. The case proceeded to jury trial. Plaintiff offered a series of documents relating to each claim brought by each insured, which were admitted into evidence primarily by stipulation: the final invoice, a supplemental report itemizing all the work done by plaintiff and identifying charges made by plaintiff that defendant's claims adjuster did not believe were covered by the insurance policy, a separate itemized bill for painting costs incurred, plaintiff's accounting ledger for each claim, the contract between plaintiff and the insured authorizing plaintiff to repair the insured's vehicle, and the assignment of insurance claims by the insureds to plaintiff. Mr. Parker, the owner of the repair shop, testified on direct examination to his experience repairing vehicles and to the billing and repair processes employed in his shop. He compared, in some respects, the practices employed in his shop to those used by defendant's claims adjuster.

¶ 5. After plaintiff rested its case, defendant moved for judgment as a matter of law. See V.R.C.P. 50(a)(1). The trial court denied this motion, after which defendant presented testimony by one witness: claims adjuster Alan Douse. Mr. Douse explained the procedures that he follows to inspect damaged vehicles belonging to defendant's insureds, appraise the amount of damage to a vehicle, and issue payments to insureds based upon his estimate. After receiving

3

instructions, the jury returned a verdict finding defendant liable for breach of the insurance policy and awarding plaintiff $41,737.89.

¶ 6. Defendant filed a renewed motion for judgment as a matter of law under Vermont Rule of Civil Procedure 50(b), which the court granted. The court construed the insurance policy as requiring defendant to pay "an amount [defendant] determined was sufficient to do the repairs." It reasoned that the insureds could not have sued defendant for sums that were entirely within defendant's discretion to award. Therefore, the court explained, plaintiff could not sue defendant as the insureds' assignee. In reaching this conclusion, the court relied heavily on an out-of-state case involving an auto-glass repair shop, which sued an insurer as the insureds' assignee. Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins., 115 P.3d 751, 755 (Idaho 2005). Plaintiff appeals the trial court's order granting defendant judgment as a matter of law.

## II. Defendant May Not Unilaterally Determine the Value of an Insured's Claim

¶ 7. We review the interpretation of an insurance policy without deference. Co-operative Ins. v. Woodward, 2012 VT 22, ¶ 8, 191 Vt. 348, 45 A.3d 89. We therefore review anew the trial court's determination that under the policy the amount owed to an insured is fully within defendant's discretion to determine. An insurance policy must be "construed according to its terms and the evident intent of the parties as expressed in the policy language." Smith v. Nationwide Mut. Ins., 2003 VT 61, ¶ 11, 175 Vt. 355, 830 A.2d 108 (quotation omitted). When interpreting an insurance policy, the language is to be viewed "from the perspective of what a reasonably prudent person applying for insurance would have understood it to mean." Shriner v. Amica Mut. Ins., 2017 VT 23, ¶ 6, 204 Vt. 321, 167 A.3d 326 (quotation omitted). We resolve ambiguity in an insurance policy in favor of an insured, but we do not rewrite a policy if it happens to benefit an insurer. Id.

¶ 8. The claims in this case arise under defendant's Century II Collision Insurance Policy ('the policy'). Under the policy, defendant promises to pay for "direct and accidental loss

4

of, or damage to" an insured vehicle.[2]  However, this is subject to a limitation-of-liability provision mandating that "direct and accidental loss" cannot exceed "the cash value of the auto or its damaged parts at the time of loss."  The calculation of "cash value" where the limitation-of-liability clause is invoked includes "consideration of fair market value, age, and condition of the property in question at the time of loss."  The policy specifies that the insurer has three methods from which to choose to satisfy its obligation to an insured to pay for the "loss" or "damage": pay the insured directly, repair the vehicle, or replace the vehicle.  Here it is undisputed that defendant elected to pay the insureds directly.  The parties dispute how much each insureds' "loss" or "damage" was. And the policy does not specify how, if at all, an insured may contest the valuation that defendant makes for a claim.[3]

¶ 9.    The trial court interpreted the insurance policy, which was silent on the matter, to only require defendant to pay "an amount [defendant] determined was sufficient to do the repairs." We disagree with this construction.  Just as we will not rewrite an insurance policy in favor of an insured, we also cannot rewrite a policy in favor of an insurer.  See Shriner, 2017 VT 23, ¶ 6; Medlar v. Aetna Ins., 127 Vt. 337, 347, 248 A.2d 340, 347 (1968) ("Courts can only enforce agreements as written and are without authority to rewrite contracts, even insurance contracts.  It is the duty of the court to construe contracts, not make them for the parties.").  Defendant

---

[2]  The insured is responsible for paying the deductible.  Because there is no dispute as to this detail, the Court has omitted further reference to it from its analysis.

[3]  Unlike here, some insurance policies establish procedures for either party to contest the other's valuation of a claim.  See, e.g., Milligan v. CCC Info. Servs. Inc., 920 F.3d 146, 149 (2d Cir. 2019) (noting appraisal provision in collision-insurance agreement allows insurer or insured to seek independent appraisal and appointment of "disinterested umpire" to resolve disputes on valuation of loss); Duane Reade, Inc. v. St. Paul Fire & Marine Ins., 600 F.3d 190, 193 n.3 (2d Cir. 2010) (explaining that policy insuring business interruption loss allows "either party" to "demand appraisal by two appraisers and an umpire" if they cannot agree on damages); Mason v. State Farm Mut. Auto. Ins., 177 P.3d 944, 946 (Idaho 2007) (quoting arbitration clause aimed at settling disputes over "reasonable and necessary" medical expenses arising under collision-insurance policy).

effectively conceded at oral argument that an insured may contest the insurer's valuation of a claim consistent with this policy. We therefore conclude that here the insureds or their mechanic as an assignee may challenge defendant's valuation of claims through this litigation.[4] Ambassador Ins., 2008 VT 105, ¶ 19 (explaining that assignee may take interest of assignor).

¶ 10. In reaching its decision, the trial court quoted Cascade Auto for its holding that the repair shop here had three options: "it could simply do the work and accept the amount [insurer] had stated it would pay; it could accept the insurance payment and collect the difference from the insured; or it could refuse to perform services for [the] insureds unless the customer paid . . . for the work, leaving the customer to seek reimbursement from [the insurer]." 115 P.3d at 755. Reliance on Cascade Auto was misplaced. In Cascade Auto, the insurer had sent a letter notifying the repair shop of the maximum amount it was willing to pay for certain repairs. When the same repair shop then undertook the same repairs on behalf of the defendant's insureds, the court held that a unilateral contract between repair shop and insurer formed, fixing the insurer's obligation at the amount specified in the letters. Id. Unlike Cascade Auto, here it is undisputed that there is no contract between the repair shop and the insurer. Also, the insuring clause in Cascade Auto suggested that the insurer had a unilateral right to determine the amount of an insured's damage.[5] Here, no policy language viewed "from the perspective of . . . a reasonably prudent person applying

---

[4] Responding to this Court's question of whether defendant alone could determine the value of a claim in "dollars," defense counsel admitted that "certainly [the insureds] would have an opportunity to challenge" an appraisal made by the insurer's claims adjuster.

[5] The insuring clause in Cascade Auto stated that the insureds were entitled to damage coverage, as calculated in one of two ways: (1) "the cost of repair agreed upon by us" or (2) "an estimate written based upon . . . labor rates, parts, and material prices charged by a substantial number of repair facilities in the area where the insured vehicle is to be repaired." 115 P.3d at 751-52. The court interpreted the word "us" under option (1) to mean the insurer. Id. at 754. This, the court explained, authorized the insurer to enter "unilateral agreements about what amounts it will pay . . . for repair services." Id. at 755.

for insurance" suggests that defendant may unilaterally determine the value of a claim. Shriner, 2017 VT 23, ¶ 6.[6]

¶ 11. The trial court also relied in part on two undisputed facts to conclude that plaintiff could not, as a matter of law, maintain a case challenging defendant's valuation of the insureds' claims: defendant made payments on the insureds' claims, and the insureds had their vehicles repaired. To whatever extent the trial court concluded that defendant had fully satisfied its contractual obligation under the policy because defendant made payments on the collision claims in some amount, this was error. Whether the amounts paid by defendant satisfied defendant's obligation to its insured was the central disputed issue here. And it is undisputed that defendant did not obtain a release of claim or otherwise satisfy the elements of a complete defense foreclosing the insureds, and thus plaintiff's, ability to contest the sufficiency of the payments. See Gregoire v. Ins. of N. Am., 128 Vt. 255, 259, 261 A.2d 25, 27-28 (1969) (noting elements of legal release of claim and holding that they were unproven); Auto Glass Express, Inc. v. Hanover Ins., 912 A.2d 513, 518 (Conn. App. Ct. 2006) (concluding that defense of accord and satisfaction did not apply because insurer's payment checks, which stated "fair and reasonable payment," were not "conspicuous statement to the effect that the instrument was tendered as full satisfaction of the

---

[6] The trial court cited to another out-of-state case that is factually dissimilar to these proceedings: Gaston v. Founders Ins., 847 N.E.2d 523 (Ill. App. Ct. 2006). There, the insurer notified the insured that it would pay the full cost of repair if the repairs were performed at one of its direct repair shops. A direct repair shop is a shop that has contracted with an insurer for pre-arranged rates. In Gaston, the insurer provided the insured with the names of two direct repair shops. The insurer also explained to the insured that it would only pay the rates it had negotiated with its direct repair shops, even if the insured chose another shop. The insured, however, chose to have the vehicle repaired at its preferred shop. The court in Gaston concluded that the insurer was not obligated to pay the plaintiff's shop's repair bill. Unlike Gaston, here defendant has no direct repair shops. Nor did defendant identify a shop that would have repaired the insureds' vehicles for the amount estimated by the insurer. Yet the trial court, quoting Gaston, asserted that "the 'amount necessary' refers to the amount the insurer must spend to repair the vehicle, not the amount the insured decides to spend." Id. at 538 (emphases in original). Even if we were to adopt this rule, it has no application here because defendant has not identified a shop willing to repair at its proposed rate.

7

claim"). As to the second issue, the fact that the insureds' vehicles were fully repaired and returned does not answer the question of whether the costs incurred by the repair shop to do so were covered under the policy. See Nick's Garage, Inc. v. Progressive Cas. Ins., 875 F.3d 107, 114 (2d Cir. 2017) (explaining that insurer's argument—that insureds suffered no damages because vehicles were repaired and returned to insureds—has "no merit" because it ignores alleged short pay; moreover first-party insureds were financially responsible to repair shop under repair contract).[7] Therefore we conclude that the amount owed to the insureds under the policy is not entirely within defendant's discretion and plaintiff may sue defendant as the insureds' assignee to challenge defendant's valuation of the claims.

### III. Defendant Is Not Entitled to Judgment

¶ 12.    Next defendant argues that the policy does not promise to pay a repair shop's bill. This misunderstands the central dispute over a short pay: an insurer may only refrain from paying an insured amounts that are not covered by the policy. Here the policy promises to pay "direct and accidental loss or damage to" a covered vehicle. It does not specify how this is to be calculated when the insurer elects to pay an insured directly for its loss, except that this figure cannot exceed "cash value." "Cash value" is also undefined in the policy but must account for "fair market value, age, and condition of the property" at the time of loss.

¶ 13.    With no definition of "damage" in the policy, we construe this term consistently with general principles of the law of remedies, interpretations of the standard collision-insurance

---

[7] Defendant cites to two out-of-state opinions: Valley Paint & Body v. Ins. of the State of Pa., 2011-Ohio-1307, 2011 WL 947034 (Ohio Ct. App. March 21, 2011) and Valley Paint & Body v. Nat'l Union Fire Ins., 2011-Ohio-1308, 2011 WL 947036 (Ohio Ct. App. March 21, 2011). In both of these cases, which also involved the post-loss assignment of collision-insurance claims brought by a repair shop on behalf of insureds, the court concluded that because the repair shop never sought to collect on its bills directly from the insureds, the insureds "failed to provide evidence of economic damages resulting from the alleged breach of contract by the insurance company." Ins. of the State of Pa., 2011 WL 947034, at *4; Nat'l Union Fire Ins., 2011 WL 947036, at *4. These cases do not explain the relevance of a repair shop's failure to make demand where the issue is whether the insurer fully satisfied its obligations.

policy, and the policy as a whole, particularly the limitation-of-liability clause. We conclude that "damage" here means the amount of money needed to repair an insured vehicle to preaccident condition not to exceed the value of the vehicle before the accident.

¶ 14.    The measure of damages when an item is harmed but not taken or destroyed is usually diminution in market value; but this often is to be measured by the sum necessary to repair the item. Birchwood Land Co. v. Ormond Bushey & Sons, Inc., 2013 VT 60, ¶ 16 n.4, 194 Vt. 478, 82 A.3d 539 (citing 1 D. Dobbs, Dobbs Law of Remedies § 5.13(1), at 836-38 (2d ed. 1983)). The same is true of third-party liability claims for damage to a vehicle, which is measured by the difference in fair market value before and after the vehicle was damaged, and cost of repair can be introduced as evidence of the diminution in value. Purington v. Newton, 114 Vt. 490, 494, 49 A.2d 98, 100 (1946). However, according to the common interpretation of the standard collision-insurance policy, the term "damage," when repairs are economically feasible, is the cost of repair to preaccident condition. See Couch on Insurance, supra, § 177:2 ("[T]he standard [collision policy] has been construed to limit liability for a partial loss of the vehicle to either actual cash value or the cost of repairing or replacing damaged parts (rather than the whole car), whichever is the smaller in amount.").

¶ 15.    We conclude that the common interpretation of the standard policy applies here because this construction is necessary to give meaning to the limitation-of-liability clause. Under the limitation clause, "damage" cannot exceed "cash value" accounting for "fair market value, age, and condition of the property." "Cash value" thus means preaccident fair market value. This is consistent with how we have previously interpreted "cash value" under other insurance policies. See Eagle Square Mfg. Co. v. Vt. Mut. Fire Ins., 125 Vt. 221, 223, 212 A.2d 636, 638 (1965) (affirming trial court determination that "actual cash value," as used in fire-insurance policy, means appraisal value less depreciation). Here if, as in Purington and Birchwood, "damage" were to mean the difference in pre- and post-accident market value, the limitation clause capping

damages at preaccident market value would have no meaning. See Dep't of Corr. v. Matrix Health Sys., P.C., 2008 VT 32, ¶ 12, 183 Vt. 348, 950 A.2d 1201 (explaining that when interpreting contract, "we must consider the contract as a whole and give effect to every part contained therein to arrive at a consistent, harmonious meaning, if possible" (quotation omitted)).

¶ 16. Thus "damage" under the policy means cost of repair to preaccident condition, which must be paid unless repairs are uneconomical. If the cost of repairing a damaged vehicle exceeds the preaccident fair market value, then the vehicle is considered a "total loss," or in shorthand it is said to be "totaled."[8] See Citizens' Sav. Bank & Trust Co. v. Fitchburg Mut. Fire Ins., 86 Vt. 267, 267, 84 A. 970, 972 (1912) (establishing measure of damages for total loss under fire-insurance policy). In that case, repairs need not be paid for because the insurer may satisfy its obligation to the insured by paying the insured the fair market value of the vehicle before it was damaged. Id.

¶ 17. Here, because no vehicle was a total loss, under the policy "damage" is the cost to repair each vehicle to preaccident condition. The policy does not define how cost of repair is to be determined.[9] Courts in other jurisdictions have construed the proper method for calculating cost-of-repair damages under a collision-insurance policy in two ways: payment of a reasonably competitive market rate to restore a damaged vehicle to its preaccident condition, and payment of

---

[8] Vehicle damage claims involve "readily ascertainable" methods such as Kelley Blue Book for determining fair market value, unlike other items of personal property; therefore, capping damages at the fair market value of the vehicle at the time of the accident makes sense. State v. Tetrault, 2012 VT 51, ¶ 13, 192 Vt. 616, 54 A.3d 146 (mem.) (noting in criminal-restitution context that cost of repair is reasonable damages methodology rather than replacement cost for property without "readily ascertainable" market value such as "used toasters or microwaves").

[9] There are collision-insurance policies that define how cost of repair is to be determined. See, e.g., Sonnier v. State Farm Mut. Auto. Ins., 509 F.3d 673, 675-76 (5th Cir. 2007) (explaining that policy covering "direct and accidental loss of or damage to" a covered vehicle, is to be determined by: "(1) a price agreed upon by the insured and insurer; (2) a competitive bid approved by [insurer]; or (3) an estimate written based upon prevailing competitive price" (quotation omitted)); Blakely v. State Farm Mut. Auto. Ins., 406 F.3d 747, 749 (5th Cir. 2005) (same). Here, defendant could have, but did not, include a method to calculate damages in the policy.

the lowest available rate to return the vehicle to preaccident condition.  Compare Auto Glass Exp., Inc. v. Hanover Ins., 975 A.2d 1266, 233 (Conn. 2009) (holding that insurer must pay amount reasonable in marketplace, rather than lowest available rate, thus resolving insurance policy ambiguity in favor of insured), with Home Mut. Ins. of Iowa v. Stewart, 100 P.2d 159, 162 (Colo. 1940) (requiring payment of lowest good-faith bid obtained by insurer where insurer elected to repair rather than pay directly for loss and insured refused to relinquish possession), and Gambale v. Allstate Ins., 228 A.2d 58, 59-60 (Pa. Super. Ct. 1967) (holding that lower of two estimates must be paid where parties stipulated both shops were "reputable" and would do "proper" job), and Couch on Insurance, supra, § 177:14 ("[I]nsurer is typically liable only in the amount of the lowest of all acceptable estimates for repair.").  Cf. Chick's Auto Body v. State Farm Mut. Auto. Ins., 401 A.2d 722, 731-32 (N.J. Super. Ct. 1979) (rejecting antitrust claims asserted by repair shops against collision insurers and noting "practice of [a collision insurer] to calculate the reimbursement for its insured based upon the lowest prevailing price in the marketplace (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition").  Here, whatever method for calculating cost of repair might be appropriate under the policy—the interpretation of the policy in this regard has not been appealed in this case[10]—defendant's argument that the policy does not explicitly require payment of a repair

---

[10] Current state insurance regulations would permit a variety of methods of measuring cost of repair.  See Regulation I-79-2 Fair Claims Practices § 8, Code of Vt. Rules 21 020 008, https://www.lexisnexis.com/hottopics/codeofvtrules (establishing standards for settling property or physical damage claims involving partial losses, including requiring insurer to "make every reasonable effort to reach an agreed price" if insured selects the repairer); Cf. Levy v. State Farm Mut. Auto. Ins., 150 Cal. App. 4th 1, 4 (Cal. Ct. App. 2007) (policy providing for payment of "prices charged by a majority of the repair market . . . as determined by a survey made by [the insurer]" complies with regulations so long as insurer provides list of "some facilities that will perform the repairs at the prevailing competitive price" upon request (emphasis omitted)); Rizzo v. Merchants & Businessmen's Mut. Ins., 188 Misc. 2d 180 (N.Y. Sup. Ct. 2001) (describing New York regulatory scheme in which initially insurer cannot steer insureds to specific shop; however, after good-faith negotiations have failed, insurer must furnish insured with a name, in writing, of shop that would accept insurer's repair estimate; if insured nevertheless selects independent shop, insured bears burden of proving repair costs are reasonable and necessary to restore damaged

shop's bill ignores the actual issue: whether plaintiff's bills here were covered. The jury determined that they were.

¶ 18. Defendant next argues that there was no "legally sufficient evidence" presented at trial showing that the insureds suffered a "financial loss," as required under the trial court's jury instructions. The court instructed the jury as follows:

> Cause of damages. To prove that a customer was damaged by a breach of contract, Parker's must prove that the breach of contract caused the customer some financial loss and must prove the amount to you. If you find that Nationwide did not breach any contracts, you are done. However, if you find that it did breach any contracts, then you must determine the amount of damages that customers have suffered, if any. I am giving you instructions about damages so that you will know how to proceed if you reach this point in your deliberations. It does not mean that I have any opinion whether you should or should not award damages in this case.

Defendant asserts that "an incurred but unpaid debt" is not a "financial loss," so no reasonable juror could have found liability against defendant under these instructions. However, this case is about an insurer's alleged failure to compensate its insureds, as promised in the policy. If defendant paid less than was owed—i.e., the "direct and accidental loss of or damage to" the vehicle—then that unpaid sum is, to adopt the definition of "financial loss" advanced by defendant in its briefing, a "decrease in amount, magnitude, or degree" that "relate[s] to [the] finances" of the insureds. Cf. Miller v. Robertson, 266 U.S. 243, 249 (1924) (explaining that "cause of action for damages for breach of contract is a debt within the meaning of the Bankruptcy Act, and of laws

---

vehicle to preaccident condition). We refrain from adopting one method of determining cost of repair under this policy because, by not raising this issue, the parties effectively delegated interpretation of the policy on this matter to the jury. Moreover, under the facts in this case, it would not matter whether we construed the policy as covering the lowest available good-faith rate or any reasonable repair rate because the only evidence presented on the actual cost to repair the insureds' vehicles came in the form of the itemized bills admitted into evidence by plaintiff. Defendant provided no indication that its claims adjuster's estimates—none of which were admitted as evidence—would have been accepted by a repair shop. Thus, the jury could have reasonably inferred that plaintiff satisfied either standard: plaintiff's bills were the lowest available rate to restore the damaged vehicles to preaccident condition and plaintiff's bills represented a reasonable rate for doing so.

12

relating to attachments, to receiverships, to stockholders' liability for corporate debts, to probate, to set-offs, to fraudulent conveyances. and to limitation of actions," thus statutory term "debt" included more than just "causes of action cognizable in debt under technical procedural rules").

¶ 19.  Next defendant argues that because plaintiff never sought to collect on its bills from the insureds the bills were not a "financial loss."[11] We reject this argument for two reasons. Again, this ignores the real issue in this case: whether defendant satisfied its obligation to its insureds under the policy. Second, an assignee may seek to collect an unpaid debt on behalf of its assignor. Sprint Commc'ns Co., v. APCC Servs., Inc., 554 U.S. 269, 272 (2008).  Here the assignments, which were admitted as exhibits by stipulation, granted plaintiff the right to "collect money due or owed" under the insureds' insurance claims. It is no defense that the assignors delegated collection to an assignee.

¶ 20.  Last, defendant argues that it was not required to pay "repair and labor costs" because the policy provides for the payment of labor costs under the towing clause but not the collision-coverage insuring clause. We are not convinced. As explained above, the policy covers the cost of repair to preaccident condition or the payment of preaccident fair market value, whichever is less. Here because none of the vehicles were totaled, the cost of repair to preaccident condition was the proper measure of damage. Labor is an indispensable component of the cost to make a repair. Moreover, defendant's opening statement and the only witness that defendant

---

[11] Defendant's argument effectively asks us to impose a cash-basis accounting system to our damages analysis because of the jury instruction requiring a "financial loss" by the insureds to have been proven. We decline to do so. As background, businesses can, for various reasons, choose to employ either a cash-basis accounting system or an accrual-basis accounting system. Cash-basis accounting does not record assets or liabilities until they are actually paid. Accrual-basis accounting records assets and liabilities when they are incurred. See J. Naughton & H. Spamann, Fixing Public Sector Finances: The Accounting and Reporting Lever, 62 UCLA L. Rev. 572, 581-84 (2015) (defining cash-basis and accrual-basis accounting with examples). Contrary to defendant's argument, the term "financial loss" in the jury instructions here does not require the presentation of evidence of cash-basis losses to the exclusion of losses that would be booked on an accrual-basis. A reasonable jury could find evidence of either to be a "financial loss."

offered at trial effectively admitted that the policy covers, to some degree, labor costs for making a repair. Furthermore, the canon of interpretation relied upon here by defendant, expressio unius, has been criticized when it is used as a singular basis for judicial decision making. See Black's Law Dictionary 620-21 (8th ed. 2004) (describing negative inference canon as "best example" of a " 'maxim masquerading as [a] rule of interpretation while doing nothing more than describing results reached by other means' " (quoting R. Dickerson, The Interpretation and Application of Statutes 234-35 (1975))). We therefore conclude, from the perspective of a reasonably prudent applicant for insurance, that a collision-insurance policy covering the "direct and accidental loss of or damage" not to exceed "cash value" does not exclude from coverage a mechanic's labor simply because a separate towing clause explicitly mentions the word "labor" and the insuring clause does not contain that word. To whatever extent coverage for "damage" to a covered vehicle is ambiguous on this issue, we resolve the ambiguity in favor of the insured. Cincinnati Specialty Underwriters Ins. v. Energy Wise Homes, Inc., 2015 VT 52, ¶ 16, 199 Vt. 104, 120 A.3d 1160.

Reversed and remanded. The court shall vacate judgment for defendant and enter judgment in favor of plaintiff in the amount of $41,737.89.

FOR THE COURT:

Associate Justice

14